NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3891
_____

GUY SILEO, JR.,
                              Appellant

v.

SUPERINTENDENT SOMERSET SCI; THE DISTRICT ATTORNEY OF THE
COUNTY OF MONTGOMERY; THE ATTORNEY GENERAL OF THE STATE
OF PENNSYLVANIA
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civ. Action No. 2-12-cv-03803)
District Judge: Honorable Joel H. Slomsky

Submitted Under Third Circuit L.A.R. 34.1(a)
November 4, 2016
_____

Before: JORDAN, GREENAWAY, JR., and RENDELL, *Circuit Judges*.

(Opinion Filed: July 26, 2017)

_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*.

In this ineffective assistance of counsel case, Guy Sileo, Jr., Appellant, appeals from the denial of his Petition for a Writ of Habeas Corpus. For the reasons set forth below, we affirm the judgment of the District Court.

## I.   BACKGROUND

On December 26, 1996, Jim Webb was murdered on the third floor of the General Wayne Inn ("Inn") in Lower Merion, Pennsylvania between 7:00 PM and 12:00 AM. On August 1, 2001, a jury found Appellant guilty of Webb's murder in the first degree and of possessing an instrument of a crime.

Since that time, Appellant has challenged his sentence in three ways. First, with a counsel different from the one who represented him at trial, he filed a direct appeal that raised eighteen arguments. The state courts rejected each of these arguments. None of these arguments are before us.

Second, after having failed on his direct appeal, Appellant filed a timely Post Conviction Relief Act ("PCRA") petition. In that petition, Appellant sought relief on six grounds. The state courts found these grounds unpersuasive. One of these arguments is before us.

Third, after he exhausted his state remedies, Appellant filed the instant Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. The District Court referred the case to a magistrate judge, who recommended that the District Court deny the Petition. The District Court adopted the recommendation. Appellant sought a Certificate of

Appealability and we granted the request to one question: "[W]hether appellant was prejudiced by the absence of [an alibi] instruction in light of the prosecutor's arguments at closing . . . ." App. 46. To that question, we now turn.

## II. JURISDICTION

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

The parties do not agree on the proper standard of review. They agree that Appellant raised this issue in front of the state courts in his PCRA petition and that the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") applies and denies relief sought on the merits unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]," 28 U.S.C. § 2254(d)(2).

The parties disagree about whether the second exemption applies.[1] For the purposes of this appeal, we need not resolve this debate because, even under the less deferential *de novo* test, Appellant's argument fails.

---

[1] Appellant concedes that the first exception to AEDPA, § 2254(d)(1), does not apply because he did not raise it on appeal and because appellants generally waive issues that they do not reference in their opening briefs. *See, e.g.*, *FDIC v. Deglau*, 207 F.3d

3

# IV.   ANALYSIS

To claim the denial of effective counsel, as guaranteed by the Sixth Amendment, Appellant must prove that the "representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993).  To prove prejudice, Appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  To meet this threshold, "The likelihood of a different result must be substantial, not just conceivable," *Harrington v. Richter*, 562 U.S. 86, 112 (2011), and, "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.  Finally, "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697.  Pursuant to the Supreme Court's instruction, we decide Appellant's claim on the test's second prong.

Appellant argues that his trial counsel ineffectively represented him because the trial counsel presented an alibi defense but failed to request an alibi instruction and because the Commonwealth exploited this error by shifting the burden of proof onto Appellant.

---

153, 169 (3d Cir. 2000) (stating that if appellants "did not raise this issue in their opening brief on appeal[,] [t]hey have therefore waived it, and we will not address it").

4

This argument fails.  Under Pennsylvania law, "[A] trial court, faced with alibi evidence, should instruct a jury generally that it should acquit if [defendant's] alibi evidence, even if not wholly believed, raise[s] a reasonable doubt of his presence at the scene of the crime at the time of its commission and, thus, of his guilt."  *Commonwealth v. Hawkins*, 894 A.2d 716, 717–18 (Pa. 2006) (alterations in original) (footnote omitted) (internal quotation marks omitted).  Pennsylvania's highest court requires this alibi instruction because "infer[ing] guilt based upon a failure to establish an alibi contravenes the presumption of innocence and the Commonwealth's burden of proving the offense beyond a reasonable doubt."  *Id.* at 718 (internal quotation marks omitted).

Appellees argue that Appellant failed to present an alibi defense and, as a result, that the obligation to provide an alibi instruction never arose.  As Appellees concede, however, Pennsylvania's intermediate court of review held that Appellant had provided sufficient evidence to raise an alibi defense at trial.  We need not resolve this dispute because Appellant's claim fails even if his trial counsel did present an alibi defense.

Appellant has not provided any evidence that the missing alibi instruction played a conceivable—let alone a substantial—role in the jury's decision and that adding a proper alibi instruction would have affected the outcome in any way.  We have previously rejected similarly unsubstantiated pleas for relief.  *Palmer v. Hendricks*, 592 F.3d 386, 394 (3d Cir. 2010) (rejecting an ineffective assistance of counsel claim because "[w]hat is *not* fleshed out in the petition, however, is a *factual basis* suggesting that [Petitioner] was prejudiced by his attorney's alleged conduct" (second emphasis added)); *Thomas v.*

5

*Horn*, 570 F.3d 105, 122 (3d Cir. 2009), *as corrected* (July 15, 2009) (finding that defendant had not proven prejudice because "[Petitioner] has provided not a *shred of evidence* suggesting any probability that, had his trial counsel life-qualified every juror, at least one juror would have voted to sentence [Petitioner] to life imprisonment" (emphasis added)); *Fahy v. Horn*, 516 F.3d 169, 198 (3d Cir. 2008) ("agree[ing] with the District Court that [Petitioner] has not presented *evidence* of a reasonable probability that, despite the strength of the other evidence . . . , the exclusion of the confession would have altered the results of the trial" (emphasis added)).

Indeed, contrary to Appellant's argument, the available evidence suggests that the jury may have dismissed the alibi defense altogether; hence, the absence of an alibi instruction. The strength of the alibi defense rested largely on the jury's perception of Appellant's credibility. The jury could have reasonably questioned Appellant's credibility because Appellant had been convicted of perjury when he lied about owning a gun that was implicated in Webb's murder. Because Appellant had already committed perjury, the jury may have ignored the alibi defense entirely.

Even if the absence of an alibi instruction did have a conceivable impact on the jury's decision, this impact did not make the likelihood of a different result substantial because the Commonwealth presented overwhelming evidence of Appellant's guilt.

In the District Court, the Magistrate Judge detailed the evidence presented at trial and reviewed each aspect that supported the jury's verdict, and concluded that "[t]he verdict here was not 'weakly supported by the record.'" *Sileo v. Rozum*, 2014 WL

10741099 at \*20 (E.D. Pa. Sept. 22, 2014) (quoting *Rolan v. Vaughn*, 445 F.3d 371, 681 (3d Cir. 2006), *adopted by Sileo v. Rozum*, 2015 WL 7444820 (E.D. Pa. Nov. 24, 2015)). "Rather, the jury was presented with a substantial quantum of evidence of Petitioner's guilt from a variety of sources." *Id.* The District Court adopted the Magistrate Judge's Report and Recommendation. Although the District Court noted a few factual discrepancies in the Magistrate Judge's Report, it agreed with the Magistrate Judge's views of the record's clear support for the verdict. We agree with the Magistrate and District Court Judges. Assuming a de novo standard, we now review this evidence, albeit in a summary fashion.

First, the Commonwealth presented evidence of Appellant's financial motivations for murdering Webb. Webb and Appellant purchased the Inn together as business partners in 1995 for $1,286,000. To finance the purchase, they borrowed over a million dollars and received a $100,000 payment from Appellant's father. Webb bought a $650,000 life insurance plan and made the partnership's creditors the highest priority beneficiaries. In 1996, Webb and Appellant opened the Inn. The Inn showed early signs of insolvency and Appellant asked Webb to sign a document that characterized the father's payment as a loan, rather than as a gift. Webb refused to sign the document. After Webb's death and as the partnership's surviving partner, Appellant signed the document himself and turned the father into a creditor. As one of the partnership's creditors, the father could then claim a portion of Webb's life insurance plan. After Webb's death, the Inn received a large infusion of cash from Webb's life insurance plan

7

and approximately $215,000 remained from the plan to satisfy other business debts, like the one purportedly owed to Appellant's father. These financial windfalls, precipitated by Webb's death, constituted financial motivations for murdering Webb, according to the Commonwealth.

Second, the Commonwealth proffered evidence of Appellant's personal motivation for killing Webb. By the time of Webb's death, his relationship with Appellant had deteriorated and had become hostile. Webb's sister testified that Webb told Appellant that he would not pay Appellant because he neglected his professional duties, drank excessively, and engaged in an extramarital affair. Webb's wife testified that Webb and Appellant "were not getting along" and the two physically fought in the Inn. App. 9. This animosity could have motivated Appellant to kill Webb, the Commonwealth argued.

Third, the Commonwealth provided evidence that Appellant had planned Webb's murder. A bartender at a bar frequented by Appellant testified that Appellant asked him, weeks before the murder, "[D]o you know of countries that we don't have any extradition treaties with, like if you wanted to—where—somewhere you could hide-out if you wanted to kill somebody[?]" App. 13. Similarly, the Inn's pastry chef swore during the trial that Appellant told her two to three weeks before the murder, "I really feel like I need to shoot someone." App. 29. The Commonwealth presented this testimony as evidence of Appellant's plan to murder Webb.

8

Fourth, the Commonwealth offered evidence that Appellant determined, despite ambiguous evidence, that a murder had occurred before a police investigation and a trained nurse had seen the same evidence and had assumed that the victim had had an accident. Appellant discovered Webb's body on the third floor of the Inn when he arrived at work on the day after the murder. Appellant told the Inn's pastry chef, a registered nurse, that Webb had died and that they should call the police. The pastry chef ran upstairs, found Webb's body, and called the police. On the phone with the 911 operator, the pastry chef reported that Webb had "fallen and hit his head." Transcript of Notes of Testimony at 84, *Sileo v. Rozum*, No. CV 12-3803, 2015 WL 7444820 (E.D. Pa. Nov. 24, 2015), ECF. No. 29. At trial, the pastry chef explained that she had concluded that Webb had merely fallen because "he did not have a visible wound but had blood coming out of his nose and mouth" and because "[h]is head was very close to the desk." *Id*. When police officers arrived and saw Webb's body, they came to a similar conclusion because they noticed a large bulge on Webb's forehead and did not see a weapon.

Despite the absence of a weapon, the large bulge on Webb's forehead, and the short distance between Webb's body and the table, Appellant told one of the officers that someone had killed Webb and later informed Webb's wife that "Jim's been shot." App. 11. An innocent man would likely not have known about the murder's existence when a trained nurse and law enforcement officers had failed to discern the actual cause of Webb's death. Appellant's knowledge, the Commonwealth argued, proved his guilt.

9

Fifth, the Commonwealth submitted evidence that Appellant spread misinformation about the murder's investigation. When local police officers arrived at the crime scene, they found expensive wine in the bar, thousands of dollars in the Inn's safe, over five hundred dollars in Webb's pocket, and a gold chain around his neck. Yet, Appellant told an officer and later friends that it must have been a robbery because wine was missing.

Similarly, Appellant shared erroneous information with the officers investigating the murder by denying that he possessed a weapon that could have fired the murder bullet. Appellant told investigators and a grand jury that he only owned one .25-caliber pistol. A wiretap, however, recorded Appellant admitting that he owned another .25-caliber pistol, and Appellant was convicted of perjury. During trial, the Commonwealth presented expert testimony that there was a high probability that the murder bullet and some bullets in Appellant's recovered .25-caliber, Phoenix pistol had come from the same box of bullets and that a weapon, other than Appellant's recovered .25-caliber pistol, had left imprints in Appellant's holster and may have fired the murder bullet.[2] The Commonwealth presented Appellant's spread of misinformation and possession of the possible murder weapon as evidence of Appellant's guilt.

In response to this evidence, Appellant denied his guilt and recounted his story of purported innocence. He claimed that he and the staff closed the kitchen at 8:30 PM and

[2] In a Post-Trial Hearing, Appellant confirmed this physical evidence by admitting that his hidden .25-caliber pistol had fired the murder bullet but attempted to deny guilt by claiming that his former and now deceased girlfriend had pulled the trigger.

the rest of the restaurant at 9:30 PM. After everyone but Webb, Appellant's former girlfriend, and Appellant had left, the former girlfriend and Appellant asked Webb if he would like to join them at a local bar. Webb denied the invitation. Appellant drove the former girlfriend to her car in a nearby parking lot. The former girlfriend turned on her car but the car stalled. Appellant and the former girlfriend restarted the car and parted ways at approximately 10:00 PM. The former girlfriend drove to a friend's house. Appellant drove approximately eighteen minutes to a local bar and testified that he arrived at about 10:20 PM. During the cross-examination, Appellant stated that no one could confirm where he was after the former girlfriend[3] left the parking lot and before he arrived at the bar. Appellant stayed at the local bar until around 11:00 PM. A detective testified that Appellant had told a similar story when interviewed on the day after the murder. Under Appellant's timeline, he spent no time alone at the crime scene.

The Commonwealth refuted Appellant's timeline by presenting evidence to question Appellant's representations of when the former girlfriend and Appellant left the parking lot. The Commonwealth undermined Appellant's testimony about when the former girlfriend departed by examining the former girlfriend's friend, whom the former girlfriend had visited on the night of the murder. According to the friend, the former girlfriend must have left the parking lot at sometime between 9:45 PM and 10:00 PM because she had arrived at the friend's house sometime between 10:00 PM and 10:15 PM

---

[3] The former girlfriend passed away before trial.

and because it took approximately fifteen minutes to drive from the Inn to the friend's house.

The Commonwealth challenged Appellant's testimony about when he left the parking lot by examining a bartender employed by the local bar. According to the bartender, Appellant must have left the parking lot sometime between 10:12 PM and 10:27 PM because Appellant arrived at the bar between 10:30 PM and 10:45 PM and because it takes approximately eighteen minutes to drive from the Inn to the local bar. During cross-examination, Appellant's lawyer asked the bartender how he remembered this time and the bartender testified that he looked at the clock when Appellant arrived because "it was a slow night." Transcript of Notes of Testimony at 27, *Sileo v. Rozum*, No. CV 12-3803, 2015 WL 7444820 (E.D. Pa. Nov. 24, 2015), ECF. No. 36. Under the Commonwealth's timeline, Appellant spent between twelve and forty-two minutes alone at the crime scene. Taken together, these facts amount to overwhelming evidence of guilt and a conclusion that the alibi evidence was weak.

A.    **Appellant's Counterarguments**

Appellant provides three counterarguments. First, Appellant argues that the evidence of guilt could not have been overwhelming because it was circumstantial. Second, Appellant contends that the evidence of guilt could not have been overwhelming because the jury deliberated for seven hours and eight minutes before delivering a verdict. Third, Appellant asserts that the alibi defense must have played a substantial role in the jury's decision because the prosecution focused on it in its closing argument.

We find these three arguments unpersuasive. Appellant's first argument fails because we do not distinguish between circumstantial and direct evidence. *See, e.g.*, *Lukon v. Pennsylvania R. Co.*, 131 F.2d 327, 329 (3d Cir. 1942) ("[C]ircumstantial evidence . . . . has probative value equal to that of testimonial evidence."); *see also* Third Circuit Model Criminal Jury Instructions § 1.09 ("The law makes no distinction between the weight that you should give to either direct or circumstantial evidence.").

Similarly, Appellant's second contention does not persuade because, as Appellant concedes, "[T]his Circuit has not specifically used the length of jury deliberations as a factor in assessing *Strickland* prejudice," Appellant's Br. at 18, and because the non-binding circuit cases cited by Appellant all involve jury deliberations that lasted at least two days[4]—more than twice as long as the deliberations here.

Appellant's final assertion lacks merit because of a logical fallacy. The prosecution's focus on the alibi defense in its closing argument may prove the alibi defense's strength *relative* to Appellant's other arguments, assuming that the prosecution would focus its attention on the defense's strongest arguments, but it cannot establish the alibi's *absolute* strength. Courts must consider prejudice in light of the totality of the evidence and not just relative to Appellant's other defenses. *Strickland*, 466 U.S. at 695.

---

[4] *Thomas v. Chappell*, 678 F.3d 1086, 1093 (9th Cir. 2012) (five days of jury deliberations); *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) (three days); *Silva v. Woodford*, 279 F.3d 825, 829 (9th Cir. 2002) (two days); *Mayfield v. Woodford*, 270 F.3d 915, 938 (9th Cir. 2001) (nearly two days); *Murtishaw v. Woodford*, 255 F.3d 926, 968 (9th Cir. 2001) (two days).

13

As a result, showing the relative strength of Appellant's alibi argument does little to further his claim.  For these reasons, we find Appellant's counterarguments unavailing.

## IV. CONCLUSION

We affirm the District Court's decision to deny Appellant's Petition for a Writ of Habeas Corpus because Appellant has not proven, as required by *Strickland*, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.