CHIEF JUSTICE SAYLOR
We allowed appeal in this post-conviction matter to consider whether Appellant is entitled to a new trial, because counsel failed to request that the jury receive an alibi instruction or object to the trial court's failure to give one.
In the early morning hours of July 4, 2008, Appellant's former girlfriend, Sonsiarae Watts, and her boyfriend, Dahl Palm, were shot to death inside Ms. Watts' home in McKees Rocks, Allegheny County. After a grand jury investigation, Appellant was charged with two counts of first-degree murder, as well as burglary and a firearms offense. At his trial, Appellant testified he was at home alone watching television or sleeping on his couch when the crimes occurred.[1] His counsel did not request an alibi instruction and the court did not give one. The jury convicted Appellant on all charges. The court imposed consecutive life sentences for the murders, a consecutive term of incarceration on the burglary charge, and no further penalty for the firearms violation.
After Appellant's judgment of sentence was affirmed on direct appeal, see Commonwealth v. Jones , No. 1870 WDA 2012, slip op., 2014 WL 10919379 (Pa. Super. June 6, 2014), he filed a counseled Post Conviction Relief Act ("PCRA") petition asserting, inter alia , he was entitled to a new trial because of counsel's ineffectiveness in failing to request an alibi instruction or object to the trial court's failure to give one. At a hearing on the petition, trial counsel testified he did not request an alibi instruction because he believed one was unnecessary since he viewed Appellant's alibi as weak - as no other witness corroborated it - and he thought the better strategy was to argue another person had murdered the victims. See N.T., Aug. 24, 2016, at 17-19. Somewhat inconsistently, however, counsel also stated he lacked a reasonable basis for failing to ask the trial court to issue such an instruction. See id. at 9, 11. The PCRA court denied relief.
The Superior Court affirmed. See Commonwealth v. Jones , No. 1781 WDA 2016, slip op. , 2017 WL 6461845 (Pa. Super. Dec. 19, 2017). The court observed that trial counsel is presumed to have been effective, and a litigant challenging counsel's stewardship can only overcome that presumption by demonstrating: (1) the underlying claim has arguable merit; (2) counsel's act or omission lacked a reasonable basis designed to advance his client's interests; and (3) counsel's ineffectiveness resulted in *1017 prejudice - meaning that, but for counsel's error, there is a reasonable probability the outcome of the proceeding would have been different. See id. at *5-*6 (citing Commonwealth v. Pierce , 567 Pa. 186, 203, 786 A.2d 203, 213 (2001) ). The court noted an ineffectiveness claim will fail if any of these prongs is not satisfied. See id. at *6 (quoting Commonwealth v. Daniels , 600 Pa. 1, 18, 963 A.2d 409, 419 (2009) ).
In reference to the claim based on counsel's failure to ask for an alibi instruction, the court explained that such an omission does not amount to per se prejudice. See id. at *7 (citing Commonwealth v. Hawkins , 586 Pa. 366, 389, 894 A.2d 716, 729 (2006) ). It also agreed with trial counsel that the proffered alibi was weak, and concluded that counsel's PCRA testimony demonstrated a reasonable basis for his trial strategy - namely, that he "believed the better strategy was to establish that another individual committed the crime[s]." Id.[2] Finally, the intermediate court indicated there was extensive trial evidence of guilt. As such, the court continued, Appellant had not demonstrated a reasonable probability that, if an alibi instruction had been given, the outcome of the trial would have been different. See id. at *7-*9.
We granted further review limited to whether the Superior Court erred in denying Appellant's claim that counsel was ineffective in failing to either request an alibi instruction or object to the trial court's failure to provide one in its final charge to the jury. See Commonwealth v. Jones , --- Pa. ----, 187 A.3d 906 (2018) (per curiam ).
"[A]n alibi is a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." Commonwealth v. Ali , 608 Pa. 71, 127, 10 A.3d 282, 316 (2010). Although an alibi may be stronger if accompanied by corroborative evidence, even absent such proofs a defendant's testimony that he was elsewhere when the crime occurred, standing alone, amounts to an alibi defense, and it is for the jury to decide how much weight to give such testimony. See Commonwealth v. Roxberry , 529 Pa. 160, 165-66, 602 A.2d 826, 828 (1992).
Here, it is undisputed that Appellant's trial testimony constituted an alibi defense, as he could not have committed the burglary and murders if he was, consistent with his testimony, at his residence when those events transpired. See id. Consequently, Appellant was entitled to have the trial court charge the jury on how to assess his alibi evidence. See id. at 165, 602 A.2d at 828 (quoting Commonwealth v. Pounds , 490 Pa. 621, 631-32, 417 A.2d 597, 602 (1980) ); Hawkins , 586 Pa. at 390-91, 894 A.2d at 730.[3] Appellant's underlying claim thus has arguable merit. Accordingly, we now evaluate the second and third elements of the Pierce test. See generally Hawkins , 586 Pa. at 389, 894 A.2d at 729 *1018 (recognizing that trial counsel's failure to request an alibi instruction to which the defendant was entitled does not automatically warrant a new trial, but rather, invokes the three-step Pierce standard for ineffective assistance of counsel).
The second aspect of the Pierce analysis relates to whether trial counsel had a reasonable basis for his act or omission designed to further his client's interests. In terms of counsel's failure to request an alibi instruction when the defendant is entitled to one, Roxberry seemed to leave little room for the possibility that counsel may have had a reasonable basis, labeling counsel's failure along these lines "inexplicabl[e]." Roxberry , 529 Pa. at 166, 602 A.2d at 829. The Court in Hawkins , however, rejected the precept that Roxberry established a rule of per se ineffectiveness when counsel fails to ensure an alibi instruction is given. It clarified, instead, that it is possible for counsel to have a reasonable basis, and hence, evaluation of the second element of the Pierce standard must be made on a case-by-case basis. See Hawkins , 586 Pa. at 391, 894 A.2d at 731.[4] Accord Commonwealth v. Mikell , 556 Pa. 509, 516-17, 729 A.2d 566, 570 (1999) (reciting that a PCRA petitioner must satisfy all three Pierce factors to succeed on an ineffectiveness claim based on counsel's failure to request an alibi charge).
As recounted above, trial counsel testified at Appellant's PCRA hearing that he viewed Appellant's alibi as weak since it was uncorroborated, and he thought a better strategy was to argue that another person was the perpetrator.[5] This explanation lacks substantial force. One of the main objectives of an alibi instruction is to explain that even a weak alibi can form a basis for acquittal so long as it raises a reasonable doubt in the minds of the jurors. See supra note 3; Mikell , 556 Pa. at 517-18, 729 A.2d at 570-71. Further, as counsel's third-party-perpetrator theory was consistent with the defense claim that Appellant was at home when the killings took place, it would not have been undermined by an alibi charge. Moreover, and as noted, counsel conceded during his PCRA testimony that he lacked a reasonable basis for failing to ask the trial court to provide the jury with an alibi instruction or object to its absence from the jury charge. We therefore conclude that Appellant has satisfied the second prong of the Pierce inquiry by demonstrating that counsel lacked a reasonable basis for his omission.
In light of the above, resolution of this appeal turns on the final Pierce factor: whether counsel's omission resulted in prejudice. In the context of a post-conviction challenge to counsel's stewardship, prejudice is established where the truth-determining process was so undermined *1019 that "no reliable adjudication of guilt or innocence could have taken place," 42 Pa.C.S. § 9543(a)(2)(ii), i.e. , there is a reasonable probability that, but for counsel's error, the outcome of the trial would have been different. See Commonwealth v. Laird , 632 Pa. 332, 343, 119 A.3d 972, 978 (2015) (citing Commonwealth v. Harris , 578 Pa. 377, 387, 852 A.2d 1168, 1173 (2004) ). This does not mean a different outcome would have been more likely than not; a reasonable probability is a probability "sufficient to undermine confidence in the outcome of the proceeding." Id. (citing Commonwealth v. King , 618 Pa. 405, 416, 57 A.3d 607, 613 (2012) ). Still, a speculative or attenuated possibility of a different outcome is insufficient to undermine confidence in the outcome. See Harrington v. Richter , 562 U.S. 86, 112, 131 S. Ct. 770, 792, 178 L.Ed.2d 624 (2011) ("The likelihood of a different result must be substantial, not just conceivable." (citation omitted)).[6]
Appellant offers only a brief, one-paragraph argument that he established prejudice. He notes that the Commonwealth's case against him was entirely circumstantial, as no trial witness saw him commit the crimes. He observes, as well, that no physical evidence, such as DNA or fingerprint evidence, linked him to the crime scene. Appellant states that, due to the lack of an alibi instruction, the jury was never told that it should acquit him if his alibi testimony, though not completely believed, raised a reasonable doubt as to his guilt. From this, he concludes there is a reasonable probability the outcome of the trial would have been different if such an instruction had been given. See Brief for Appellant at 17-18.
The Commonwealth responds by highlighting that Appellant bears the burden to prove prejudice, and suggesting he has not made a meaningful effort to do so here. See Brief for Appellee at 27-28. The Commonwealth also asserts Appellant was not prejudiced, and it reviews various aspects of the trial evidence which it construes as demonstrating that his alibi evidence could not have created reasonable doubt in the jurors' minds. Finally, the Commonwealth quotes the portion of the PCRA court's reasoning in which it concluded there was no prejudice because the jury charge properly instructed the jurors on how to consider all trial testimony, and Appellant's alibi lacked corroboration. See id. at 28-31.
To evaluate whether Appellant has proven prejudice, we will review the evidence introduced at trial. See Strickland , 466 U.S. at 695, 104 S. Ct. at 2069 (stating that, in making a determination as to prejudice for purposes of an ineffectiveness claim, reviewing courts must consider "the totality of the evidence" presented at trial). As a brief, introductory synopsis, it is undisputed that the crimes occurred at approximately 4:30 a.m. on Friday, July 4, 2008, when the assailant entered Ms. Watts' residence, proceeded to her master bedroom on the first floor, and killed the victims by firing at them multiple times with a .40-caliber firearm, striking each victim with six or seven rounds.[7] Amber Durrett, a friend of Ms. Watts, was sleeping on the couch in the living room with her four-year-old daughter at the time. She awoke upon hearing the shots and Ms. *1020 Watts screaming, "No, no, stop!" Ms. Durrett could see gun-muzzle flashes coming from the master bedroom, but she was unable to see the shooter. She retreated with her daughter to another room and heard the perpetrator run down the hallway and leave the house by the back door. She then called the police.
As noted, Sonsiarae Watts was Appellant's former girlfriend. Sometime after their relationship ended, Ms. Watts began dating Appellant's friend Dahl Palm, and the two had been in a relationship for several months at the time they were murdered. Mr. Palm, Ms. Watts, and Appellant were all members of the West End chapter of the Brothers of the Hammer Motorcycle Club, which met at Mr. Palm's automobile repair shop.[8]
Mr. Palm's son Brandon testified his father was the president of the chapter and Appellant was the vice president. He also stated more generally that, as of May 2008, Appellant was a long-time friend of the Palm family and had been Mr. Palm's close friend for many years. Brandon recounted an altercation at his father's shop on May 31, 2008, about five weeks before the murders. According to Brandon, he, his father, Ms. Watts, and others were at the shop when Appellant arrived on his motorcycle. Appellant approached Ms. Watts to speak with her, but she refused and started walking away. Appellant then grabbed her hair and punched her several times in the face, breaking her nose. After Mr. Palm physically intervened, Appellant rode away and Mr. Palm took Ms. Watts to the hospital.
Brandon's brother, Jordan Palm, testified he was living at Ms. Watts' residence along with his father during the relevant timeframe. His description of the altercation at his father's auto repair shop was consistent with Brandon's. Jordan added that, about a week after that incident, he was with his father (Mr. Palm), who received a call on his cell phone and mentioned to Jordan that it was from Appellant. According to Jordan, Mr. Palm then answered the call and put it on speaker phone. Jordan testified he recognized Appellant's voice on the other end, and that Appellant stated to Mr. Palm, "[Y]ou are not going to just ride off into the sunset. I'm going to kill you, her, and myself." N.T., July 19, 2011, at 232.
On cross examination, Jordan noted that a homeless alcoholic named Sam had been sleeping on a couch on the front porch of Ms. Watts' home at the time.[9] According to Jordan, Sam was supposed to pay Ms. Watts for staying at the house, as well as using the shower and eating there. Mr. Palm told Sam several days before the killings that he had to leave because he had stopped paying Ms. Watts. More generally, Jordan mentioned that, in addition to Sam and Ms. Watts, several other persons had been living at the residence, including himself, his father, Ms. Watts' son Aaron Adams, as well as Amber Durrett and her young daughter. As far as Jordan knew, none of these individuals had a key to the home.
Marquita Harris, Ms. Watts' sister, testified that: she had always spent a great deal of time with Ms. Watts and was in touch with her on a regular basis; Ms. Watts began dating Appellant in mid-2007 and terminated their relationship in December *1021 2007; Ms. Watts began dating Mr. Palm in March or April of 2008; and on May 31, 2008, she (Ms. Harris) received a call informing her that Appellant had assaulted Ms. Watts, who was taken to the hospital. Ms. Harris then went to the hospital to assist Ms. Watts and, after Ms. Watts was discharged, drove her to the police station to file a report regarding the assault. Ms. Harris subsequently accompanied Ms. Watts to obtain a protection-from-abuse ("PFA") order against Appellant.
After the May 31, 2008, incident, Ms. Watts stayed at Ms. Harris's residence for approximately two weeks and then moved back home. According to Ms. Harris, sometime in the first week of June 2008, while Ms. Watts was still staying with her, a text message from Appellant appeared on Ms. Watts' cell phone stating, "I'm going to shoot Dahl then I'm going to shoot you and go home and wake up and put a bullet in my head." Id. at 187. Ms. Harris accompanied Ms. Watts to the police station to report the text as part of the ongoing PFA proceedings. Notwithstanding these developments, Ms. Harris explained, Ms. Watts ultimately withdrew her PFA petition. Ms. Harris stated that this action was part of an agreement with Appellant whereby, in return, Appellant would not press charges against Mr. Palm who, in the interim, had assaulted Appellant and broken his jaw (discussed below).
Dahl Palm's wife, Curtis Tina Lockhart-Palm, testified she married Mr. Palm in 1999 but was separated from him at the time of the murders. She related that in early June 2008, Appellant - with whom she was acquainted but not a friend - arrived at her place of employment and informed her that her husband was dating Ms. Watts. As it turned out, Mr. Palm was also present and an argument ensued between the two men which ended with Mr. Palm striking Appellant in the face and breaking his jaw.
According to Channing Buefort, president of Pittsburgh's East End chapter of the Brothers of the Hammer Motorcycle Club (also referred to as the "Pittsburgh chapter"), in June 2008, Appellant called to ask if Mr. Buefort could obtain a gun for him. Appellant clarified he did not want people in the West End chapter to know he was looking for a gun. Mr. Buefort told Appellant he could not acquire a gun and, instead, directed Appellant to Warren Horton, a fellow member of the Pittsburgh chapter.
For his part, Mr. Horton, a state constable, testified he received several calls from Appellant in June 2008. In one of the first calls, Appellant inquired whether he could join the Pittsburgh chapter. In a later call, Appellant asked if Mr. Horton could sell him a gun. Mr. Horton replied he could sell Appellant a .38-caliber handgun, but specified the sale had to be legal and accompanied by all necessary paperwork. At this point, Appellant asked whether Mr. Horton knew anyone else who had a gun for sale.[10]
Aaron Adams, Ms. Watts' son, testified he was living at his mother's house in early July 2008. He explained there was a front door that was always locked because it locked automatically. Mr. Adams recounted that people rarely used the front door, partly because there was no parking out front. He observed there was parking in the rear and people almost always entered and exited the residence through the back door. He stated that, on the night in question - late July 3 into early July 4, 2008 - he left the residence at approximately 1:45 a.m. to go see his girlfriend. On his way *1022 out, he made sure the back door was locked. As to the question of whether Appellant had a key to the back door, Mr. Adams initially testified that Appellant possessed a key because he had stayed at the house occasionally while he was dating Ms. Watts. He admitted on cross-examination, however, that he had testified at the preliminary hearing that Appellant returned the key to Ms. Watts after their relationship ended. Still, Mr. Adams noted that Appellant may have had a copy of the key made before giving it back. See N.T., July 20, 2011, at 395, 410.
Regina Heckert, a neighbor whose apartment was next to Ms. Watts' backyard, testified she got up at 3:15 on the morning of July 4, 2008. About an hour later, she heard a series of gunshots, then a pause, then more gunshots. She looked out her window, where streetlights illuminated the area around her house. After the gunshots were over, she observed a man walking down an alley near the Watts residence. According to Ms. Heckert, he was wearing a light-colored short-sleeve shirt and dark shorts, which she believed were denim. His hair was cropped, neither long nor short, and he was of medium height with a muscular, "stocky" build. Id. at 425. Ms. Heckert stated she did not see the person's face, but that it could have been Appellant.
Terry Hediger, who worked as a homicide detective with the Allegheny County Police Department, testified he responded to the crime scene shortly after the killings occurred. He stated there were no signs of forced entry into the apartment. The detective explained that the shooter did not leave behind any blood, fingerprints, DNA, or other identifying evidence. See id. at 385-86.
An individual named Leo Thomas testified he had known Appellant since childhood as he was a close friend of Appellant's brother, Mickey Davis, who was living in Georgia at the time of the incident. Mr. Thomas lived one block from Appellant's daughter, Juanel Jones. Early in the morning of July 4, 2008, Mr. Thomas received a call from Mickey, who sounded upset. As a result of the call, Mr. Thomas spoke with Juanel and Appellant's ex-wife, Cynthia Jones, and the three went to find Appellant. Appellant was not at his home, however, nor was he located elsewhere in the neighborhood. Subsequently, as the group was waiting outside Juanel's house, Appellant, who "appeared somewhat in disarray," walked up the back steps of Juanel's house and went inside. N.T., July 21, 2011, at 590. Mr. Thomas then walked back home.
Shortly thereafter, Mr. Thomas received a second call from Mickey, whereupon he went back to Juanel's house and informed the individuals present - Appellant, Cynthia, and Juanel - that Mickey had asked him (Mr. Thomas) to drive Appellant to the police station, as by that time it was clear the police wanted to question Appellant. Mr. Thomas observed that Appellant had a "blank look on his face." Id. at 535. On the ride to the station, Mr. Thomas asked Appellant if he was okay. Appellant responded, "I'm okay now. They got just what they deserved." Id. at 537. According to Mr. Thomas, Appellant had an arrogant and boastful demeanor when he made these comments.
When Mr. Thomas and Appellant arrived in the parking lot of the public safety building, the former realized that Appellant's father was behind them in his pickup truck. Appellant's father indicated they needed to go to a different building nearby. At that point, Mr. Thomas had Appellant get into his father's truck for the rest of the trip to the station. After the group arrived at the station, sometime between 11:30 a.m. and noon, several detectives also *1023 arrived and took Appellant to a different location for questioning.
Detective Timothy Lanigan testified he was one of the officers who questioned Appellant that day. The detective stated Appellant was wearing a dark blue polo shirt, a light-colored yellow T-shirt underneath, and denim shorts. He obtained swabs of Appellant's hands for gunshot residue testing. As well, samples of Appellant's clothing were obtained and submitted to a crime lab for residue testing. Appellant was at the station for at least six hours. In this regard, the detective observed the time stamp for the hand swabs was 12:04 p.m. whereas the stamp for the clothing samples was 6:01 p.m. He explained that this long delay arose from the need to obtain a search warrant. Detective Lanigan also noted Appellant was ultimately arrested nearly two years later, in May 2010. At that time, according to the detective, Appellant was approximately 5' 8? and weighed 185 pounds. The detective stated Appellant was heavier on the date of the murders than he was at the time of his arrest. See id. at 621.
A member of the Allegheny County crime lab testified he performed residue testing on the hand swabs, and one of Appellant's palms tested positive for gunshot residue. On cross-examination, he admitted that a person lighting off fireworks, if exposed to certain types of pyrotechnic devices, might also test positive for some of the same chemicals that were recovered from Appellant's palm.
Separately, an employee from a materials-testing company testified that she analyzed the blue polo shirt, yellow T-shirt, and denim shorts the police seized from Appellant on the day of the murders. She stated that all three elements of gunshot residue - antimony, barium, and lead - were found on the denim shorts, and two of these chemicals were located on the front of the yellow T-shirt and on the inside of the blue polo shirt. In this latter respect, she explained that if the shooter had been wearing the yellow T-shirt and later wore the polo shirt over it, some of the gunshot residue might have been transferred from the outside of the T-shirt to the inside of the polo shirt. Notably, the witness also clarified that the residue she recovered could not have come from fireworks or other types of substances because all of those other items contain additional chemicals which would have been - but were not - found on the clothing samples. See N.T. July 25, 2011, at 275-77; see also id. at 278 (expressing to a reasonable degree of scientific certainty that the material recovered from the denim shorts was gunshot residue).
Several individuals testified in Appellant's defense case. Jessica Pluechel, the fiancée of Appellant's son, indicated Appellant had had surgery to correct his broken jaw after being assaulted by Dahl Palm, and that, as such, he was not eating solid foods. She asserted that, on account of his restricted diet and his pain medications, Appellant lost weight and was thin by the date of the killings. Ms. Pluechel also stated Appellant was involved in lighting off fireworks at a family picnic held on July 3, 2008. Juanel Jones gave similar testimony with regard to Appellant's limited diet. As for the ride to the police station on the morning of the murders, Ms. Jones claimed that Appellant's father, not Leo Thomas, drove Appellant to the public safety building for questioning.
Appellant's father also testified. He indicated that he had driven Appellant to the station on the morning in question and that Leo Thomas had followed in his own car.
Appellant testified in his own defense. He denied knowing why he struck Ms. Watts on May 31, 2008, but conceded he *1024 did so after she threatened to ruin his life. See N.T., July 25, 2011, at 412. While acknowledging he went to Mrs. Lockhart-Palm's place of employment to ensure she knew her husband was having an affair, he claimed he did not know why he did that. See id. at 415. As well, Appellant admitted he had a key to the back door of Ms. Watts' residence, but stated he had returned it prior to July 4, 2008. He denied having made a copy of the key. See id. at 424.
Appellant also testified his jaw surgery took place on June 20, 2008, and as a result, he had to forego physical activities including walking and working. When cross-examined about the date of the surgery, Appellant was unable to produce medical records to support his testimony. Additionally, when confronted with phone records reflecting that three calls were made from his cell phone within approximately 35 minutes before the crimes, he stated he had left his phone at the house of a friend named Robbie Hartwell, and hence, it was not in his possession at the relevant time. He also mentioned the July 3, 2008, picnic, and indicated there were "[f]ireworks for the kids," id. at 381, albeit he did not claim to have been involved in igniting them. Appellant testified he returned home from the picnic at about 11:00 p.m.[11]
Addressing the morning of July 4, 2008, Appellant testified he was home watching television or sleeping on his couch, and that he woke up at 6:00 a.m. and walked to his daughter Juanel's house. He stated he did not learn of the victims' murders until later that morning, at which point he rode with his father to the public safety building so he could be questioned by police. Appellant denied having murdered Ms. Watts and Mr. Palm, and he testified that many of the Commonwealth's witnesses - including Leo Thomas and the persons who asserted Appellant was attempting to obtain a firearm in June 2008 - had falsely testified against him, although he was unable to suggest a reason or motive for them to do so.
When evaluating prejudice based on the lack of an alibi instruction, courts have considered whether the trial court expressly charged the jury that the burden is always on the government to prove guilt beyond a reasonable doubt, and that that burden never shifts to the defendant. See, e.g. , McGonagle v. United States , 137 Fed. Appx. 373, 377 (1st Cir. 2005). This is relevant because such an instruction, if given, tends to diminish the concern that jurors might otherwise have believed that, by offering an alibi, the defendant was required to prove it rather than simply create a reasonable doubt as to his guilt. See supra note 3. See generally Strickland , 466 U.S. at 695, 104 S. Ct. at 2068 (recognizing that, in undertaking a prejudice analysis, reviewing courts assume that the fact-finder "reasonably, conscientiously, and impartially appl[ied] the standards that govern[ed] the decision"); Commonwealth v. Brown , 605 Pa. 103, 124, 987 A.2d 699, 712 (2009) (noting juries are presumed to follow the court's directions).
Here, the trial court defined the concept of reasonable doubt and then explained the government had the burden of proving guilt beyond that threshold. The court continued by emphasizing that the defendant *1025 is presumed innocent and "has no duty to prove anything ." N.T., July 26, 2011, at 571 (emphasis added); see also id. at 525 (reflecting that the Commonwealth, in its summation, also highlighted that the defendant "does not have to prove anything"). Although the judge did not specifically say Appellant had no duty to prove his alibi, it seems likely his alibi would have been understood by the jury as encompassed by the term "anything."
Further, although the Commonwealth's evidence of guilt was circumstantial, it was nonetheless substantial. It included proofs regarding Appellant having threatened to kill the two victims on multiple occasions during the month leading up to the murders, the physical evidence of gunshot residue on Appellant's clothing, the similarity of the T-shirt and denim shorts Appellant was wearing at the relevant time with that described by Regina Heckert (Ms. Watts' neighbor), the testimony by disinterested witnesses regarding Appellant's attempts to obtain a gun in June 2008, and Appellant's statement as related by Leo Thomas on the day of the killings, that Appellant was "okay now" because the victims "got just what they deserved." The strength of the government's evidence is relevant because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Strickland , 466 U.S. at 696, 104 S. Ct. at 2069 ; see Sileo v. Superintendent Somerset SCI , 702 Fed. Appx. 95, 98 (3d Cir. 2017) (holding the defendant was not prejudiced by the lack of an alibi instruction where the evidence of guilt was "overwhelming"); Ford v. State , 314 S.C. 245, 442 S.E.2d 604, 606 (1994) (same). But cf. Roseboro v. State , 317 S.C. 292, 454 S.E.2d 312, 313-14 (1995) (finding the defendant was prejudiced by the lack of an alibi instruction where the prosecutor, in his closing argument, disparaged the defendant's alibi evidence).
Appellant, by contrast, presented his own testimony that he did not commit the murders and was, instead, at home asleep or watching television when they occurred. He was unable to provide any corroboration for his version of events, nor could he could suggest any motive for the prosecution's witnesses to have lied under oath.
This discrepancy - and the divergence between the facts as recited by the Commonwealth's witnesses and those described by the defense witnesses - shaped the parties' closing arguments. Defense counsel primarily sought to discredit the evidence of guilt by stressing it was entirely circumstantial and of the type that should not be given much weight, repeatedly referring to the Commonwealth's theory as a "leap of faith." See, e.g. , N.T., July 26, 2011, at 509. By contrast, he argued, both Appellant and his daughter Juanel were credible witnesses for various reasons. For his part, the Commonwealth's attorney highlighted conflicts between the facts as related by Commonwealth witnesses and by defense witnesses, and explained that the jury would have to make credibility determinations - based on such factors as demeanor and interest in the outcome - to decide who to believe. See id. at 519-23. Finally, the trial court also charged the jury on its obligation to assess witness credibility and resolve any conflicts in the testimony, and gave it extensive guidance as to how to fulfill this obligation. See id. at 582-85.
In disposing of a claim of ineffective assistance for failure to request an alibi instruction upon a record with similarly diverging accounts, one federal appellate court recently explained that
the crucial issue at trial was witness credibility, and the parties presented the jury with two different and irreconcilable *1026 factual scenarios. The State's version directly placed [the defendant] at the scene of the crime and implicated him in the robbery. [The defendant's] version directly placed him at home and absolved him of any involvement in the robbery. The parties' closing arguments discussed the witnesses' credibility, and the trial court specifically instructed the jury that it must judge credibility. The guilty verdict necessarily establishes that the jury found the State's witnesses to be credible and believed the State's version of events. We do not believe that the inclusion of an alibi instruction would have changed the jury's credibility determination or the ultimate verdict .
Hope v. Cartledge , 857 F.3d 518, 525 (4th Cir. 2017) (emphasis added, citation omitted). The same factors present in Hope are evident here and we, like the Fourth Circuit, find that the verdicts in the present matter establish that the jury found the Commonwealth's witnesses credible and was convinced of its version of events.
Finally, while we do not discount this Court's prior explanation as to the purpose and usefulness of an alibi charge, see supra note 3, we note that such an instruction spells out what is already implicit in the general charge relating to the Commonwealth's burden to prove guilt beyond a reasonable doubt.[12] In this sense an alibi charge is unlike a jury instruction relating to a legal defense to culpability which is not otherwise subsumed within the reasonable-doubt concept. See, e.g. , Commonwealth v. Walzack , 468 Pa. 210, 220-21, 360 A.2d 914, 919-20 (1976) (discussing the "irresistible impulse" standard as the basis for an insanity defense and how it differs from other tests, as well as the diminished capacity defense to a charge of first-degree murder); Commonwealth v. Markman , 591 Pa. 249, 283, 916 A.2d 586, 606 (2007) (delineating the basis for a jury charge on the defense of duress); Commonwealth v. Heatherington , 477 Pa. 562, 569, 385 A.2d 338, 341 (1978) (concluding that a general beyond-a-reasonable-doubt instruction was insufficient to inform the jury that, to prove malice, the Commonwealth was required to disprove the defendant's self-defense contention beyond a reasonable doubt).
The consequence for present purposes is that it may be more difficult for a PCRA petitioner to demonstrate prejudice based on the lack of an alibi charge than it would be in the case of a jury instruction that would have supplied the jurors with information not already implicit in the charge actually given - particularly where, as here, the instructions as a whole clarified that the burden remained on the government to prove that the defendant was present at the time and place of the crimes and, in fact, committed them.
We pause to clarify that we have not overlooked the passage in Hawkins which expressed that precedent from the Supreme Court and from this Court, at the time, reflected a "strong inclination to find prejudice" where an alibi instruction warranted by the evidence is not given. Hawkins , 586 Pa. at 392, 894 A.2d at 731. A review of Hawkins , however, suggests that the "strong inclination" referred to was based on Pennsylvania cases setting forth a virtual per se prejudice rule, and decisions *1027 from this Court as well as the United States Supreme Court addressing the failure to give a no-adverse-inference instruction when the defendant elects not to testify.
Notably, Hawkins expressly abrogated the per se rule for omitted alibi instructions. Further, in terms of the no-adverse-inference charge, the difficulty sought to be remedied is that without such an instruction the jury might be "left to roam at large with only its untutored instincts to guide it, to draw from the defendant's silence broad inferences of guilt." Id. at 388, 894 A.2d at 729 (quoting Carter v. Kentucky , 450 U.S. 288, 301, 101 S. Ct. 1112, 1119, 67 L.Ed.2d 241 (1981) ). Indeed, Hawkins went so far as to describe a defendant's decision not to testify in his own defense as "the proverbial 800-pound gorilla looming in the corner" which "does [not] escape the notice of many juries." Id.
We do not believe such descriptions reasonably apply to the prospect that a jury will incorrectly allocate the burden of proof when the defendant adduces alibi evidence and the trial judge gives a thorough and correct explanation of the Commonwealth's burden to prove every element of the charged offense beyond a reasonable doubt - and adds that the defendant "has no duty to prove anything." N.T., July 26, 2011, at 571.
In light of the above, we hold that Appellant has not demonstrated by a preponderance of the evidence that there is a reasonable probability the outcome of the proceeding would have been different had an alibi instruction been given to the jury.[13] Thus, counsel's failure to request such an instruction or to object to the lack of one does not undermine our confidence in the jury's verdicts. That being the case, Appellant is not entitled to a new trial.
The order of the Superior Court is affirmed.
Justices Baer, Donohue, Dougherty, Wecht and Mundy join the opinion.
Justice Todd files a concurring opinion.

Appellant lived nearby in Chartiers City, a neighborhood of west Pittsburgh. The trial evidence will be discussed in more detail below.

The Superior Court did not explain how such a contention could have conflicted with an alibi defense or been undermined by an alibi instruction, nor did it mention that trial counsel had agreed he lacked a reasonable basis for his actions.

The purpose of an alibi instruction is to clarify that alibi evidence constitutes a sufficient basis for acquittal if it raises a reasonable doubt as to the defendant's guilt. As such, it guards against jurors believing a defendant who introduces such evidence is obligated to prove the alibi. See Commonwealth v. Johnson , 600 Pa. 329, 353 n.5, 966 A.2d 523, 537 n.5 (2009). Although courts in some jurisdictions have indicated a standard reasonable-doubt charge provides adequate protection, this Court has not adopted that position. See Hawkins , 586 Pa. at 392 n.21, 894 A.2d at 732 n.21.

In Hawkins , the defense attorney testified in PCRA proceedings that he decided not to request an alibi instruction because, over a twenty-year period, he had made numerous after-the-fact inquiries of jurors as to how they reacted to alibi instructions. Based on those interviews he believed that such an instruction would be counter-productive under the circumstances of that case. See id. at 373-74, 894 A.2d at 720 (quoting trial counsel's PCRA testimony on the topic, including his explanation that he believed an alibi instruction was only helpful when the defendant's assertions were corroborated by evidence from an impartial source). This Court ultimately concluded that the attorney had a reasonable basis for his decision. See id. at 390-91, 894 A.2d at 730-31.

Counsel suggested in his summation to the jury that a substance-addicted individual who had been living on Ms. Watts' porch - but had been advised several days before the incident that he had to leave - may have been the guilty party.

Our standard for assessing prejudice is the same as that reflected in Strickland v. Washington , 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). See Commonwealth v. Kimball , 555 Pa. 299, 311-13, 724 A.2d 326, 332-33 (1999).
As with all bases for relief under the PCRA, the petitioner bears the burden of proof by a preponderance of the evidence. See 42 Pa.C.S. § 9543(a).

The murder weapon was never recovered.

"West End" refers to a western portion of Pittsburgh.

Ms. Durrett described Sam as being addicted to cocaine rather than alcohol, although any such discrepancy is immaterial to this appeal. She also described him as bald and "stocky." N.T. July 21, 2011, 467. By contrast, she stated Appellant was thin at the time of the incident. See id. at 470-71.

There was testimony that Appellant did not have a license to carry a firearm.

In the Commonwealth's rebuttal case, a detective who had questioned Appellant during the afternoon of July 4, 2008, testified that Appellant made no mention of having been at a family picnic, lighting fireworks, or going to Robbie Hartwell's house on July 3, 2008. The detective did observe, though, that Appellant claimed to have met Robbie Hartwell after work that day, and that the two rode around Pittsburgh's Hill District until 11:00 p.m., at which time Appellant went home. See N.T., July 26, 2011, at 461-62.

The record reflects that the trial court gave a thorough and complete explanation of how the jury was to apply the beyond-a-reasonable-doubt standard, see N.T., July 26, 2011, at 571-73, and there is no present claim that it was defective. See generally Commonwealth v. Ohle , 503 Pa. 566, 582, 470 A.2d 61, 70 (1983) (observing appellate evaluation of a jury charge "must be based on an examination of it as a whole to determine whether it was fair or prejudicial").

In relation to Justice Todd's concern as expressed in her concurring opinion, we do not mean to suggest that the jury instruction given by the trial court in the present matter will, in all cases, suffice to negate prejudice. As previously noted, the determination of prejudice is made based on the entirety of the record, which centrally includes, not only jury instructions, but "the totality of the evidence before the judge or jury." Commonwealth v. Spotz , 582 Pa. 207, 228 n.15, 870 A.2d 822, 834 n.15 (2005) (quoting Strickland , 466 U.S. at 695, 104 S. Ct. at 2069 ). It goes without saying that the evidentiary context in which the instruction is given will be different in each case. Our holding here is based, in large part, on the proofs adduced at trial as described above.