J-S45044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JUAN ABEL SANTIAGO | : | No. 153 MDA 2024 |

Appeal from the PCRA Order Entered December 29, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002180-2016

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JUAN ABEL SANTIAGO | : | |
| | : | |
| Appellant | : | No. 160 MDA 2024 |

Appeal from the PCRA Order Entered December 29, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002180-2016

BEFORE:  OLSON, J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:                **FILED: APRIL 30, 2025**

Juan Abel Santiago and the Commonwealth have cross-appealed from the order granting Santiago's Post Conviction Relief Act[1] petition and ordering a new trial. We conclude the PCRA court erred in granting relief and Santiago

---

[1] 42 Pa.C.S.A. §§ 9541-46.

has failed to prove the claims raised in his PCRA petition. We therefore reverse.

The trial court previously summarized the factual history as follows:

On January 28, 2016, at approximately 2:10 p.m., the York City Police Department responded to the area of Park Street and Park Place, in the City of York, to investigate a report of shots fired. Upon arrival, officers did not locate a victim but soon received information that a gunshot wound victim had been recently transported by private vehicle to York Hospital. The victim, later identified as Dontay Lowrie, also known as "Mills", (hereinafter, "the victim"), succumbed to his injuries. Dr. Samuel Land, forensic pathologist, performed an autopsy the following day and determined that multiple gunshot wounds caused the victim's death.

While awaiting news of the victim's condition in the hospital's emergency bay area, the distraught individual who had moments ago transported the victim to the hospital in a gray-colored 2011 BMW sedan, identified herself as Windy Greene to York City Police Officer Timothy Clymer who happened to be present at the hospital tending to other business matters. Further, Ms. Greene indicated to Officer Clymer that she was the victim's girlfriend and an eyewitness to the shooting.

After waiting in the emergency area for approximately an hour, Detective [Jeffrey] Spence of the York City Police Department requested officers transport Ms. Greene from the hospital to the police station for an interview. Accordingly, Ms. Greene indicated that on the day of the shooting, she and the victim had been washing clothes at a laundromat when the victim received a call on Ms. Greene's cell phone from a man named "Ni" requesting that the victim meet Ni on Park Street to pick up money. The couple obliged Ni's request and set out together in Ms. Greene's car to meet Ni at the agreed upon location. After waiting several minutes for Ni to arrive, the couple surmised they were in the wrong location and traveled to a different area of Park Street closer to Roosevelt Avenue where Ms. Greene pulled over as close to the curb as the large heap of snow would permit. Ms.

- 2 -

Greene remained seated in the driver's seat while the victim remained seated in the passenger seat holding Ms. Greene's cell phone in his lap while they anticipated Ni's arrival.

A minute or so passed when Ms. Greene noticed in her rearview mirror a male approaching her vehicle on the passenger side. Ms. Greene was familiar with Ni and determined that the male approaching her vehicle was not Ni. The unknown male walked past her vehicle then reversed his step, approached the front passenger side, glanced downwardly at the victim and exchanged pleasantries with him. The victim then opened the car door and readjusted his legs to plant his feet onto the street while continuing to converse with the male. Ms. Greene could only see the male's side profile as his face was partially obscured because he wore a hooded sweatshirt with the hood tightly drawn around his face. She described his build as thick, his complexion as light and his race as African American.

As the victim and unknown male conversed, Ms. Greene observed through her rearview mirror a second unknown male approaching her vehicle along the passenger side. She was able to view the second male better than the first and described him as tall with a thin build, a light complexion and long-shaped face. This male also wore a hooded sweatshirt; however, the hood was not drawn as tightly around his face as the first male's hood. When the second male joined the first male at the opened front passenger car door, the victim stood up to greet him with a handshake, but the second male rebuffed him with the explanation that the victim "snitched" on him. The victim immediately implemented damage control and insisted that he never "ratted" on the second male and that he would never "snitch" because he regarded the male as a brother whom he loved -- an assertion which the second male flat-out rejected.

As tensions escalated, the second male forcibly shoved the victim back down into a seated position in the vehicle's front passenger seat and together with his confederate, cornered him. The first male displayed a firearm then both males began patting the victim down, rifling through his pockets, emptying the glove compartment and demanding to know what valuables the victim had on his person. During the assault, the second male produced a firearm. At one

- 3 -

point, the first male pointed his firearm at Ms. Greene and inquired of the victim what, if any, valuables she may have on her person.

Ms. Greene told the attackers that neither she nor the victim had any valuables in their possession and that she would simply like to go home. At the direction of the first male, Ms. Greene removed her keys from the ignition then instinctively elevated her hands. After a brief pause, the males fired upon the victim, striking him four times. Meanwhile, Ms. Greene stared straight ahead, opening and closing her eyes intermittently until the gunfire ceased. During the shooting, the victim had attempted to take cover by slithering into the back seat. On the victim's command to drive, Ms. Greene set out for York Hospital, but not before observing in her rearview mirror the attackers fleeing in the direction from whence they had come. Residential surveillance cameras also captured images of the assailants fleeing.

After listening to Ms. Greene's harrowing ordeal, Detective Spence directed another officer to immediately generate four 8-person photo arrays which included a photo of [Santiago], other men similar in appearance to [Santiago], and additional subjects randomly selected as a result of intelligence gathered during police neighborhood canvasing and anonymous tip calls. While Ms. Greene indicated that [Santiago's] photograph in the photo spread shared similar physical attributes to the second male, she was unable to positively identify [Santiago] as the second male.[2]

At the conclusion of the interview, Ms. Greene visited the victim's family to inform them of his passing. She was not able to call them because her cell phone, which was last in the victim's possession, was missing. Based upon information Ms. Greene provided, a family member showed her photographs obtained from Facebook which jogged Ms. Greene's memory to where she recognized [Santiago] as the second shooter. The following morning, Ms. Greene

_____

[2] Detective Spence testified that Greene stated she was five to ten percent sure of her identification. N.T., Sept. 11-15, 2017, at 568.

- 4 -

returned to the police station and identified [Santiago after being shown a Facebook photograph of him.[3]]

As detectives progressed with their investigation, it was discovered that on January 18, 2016, [Santiago] traveled to York County Prison, signed the visitor's log, and met face-to-face with an inmate named Jalon Moore. The inmate visit took place in the visiting room area. [Santiago] and Moore, separated by a glass partition, spoke to each other through a telephone-like handset. During the visit, [Santiago] vividly recalled to Moore how he and another fellow named "Sharp" recently conspired to kill the victim whom they spotted in traffic. [Santiago] stated to Moore that while he was garbed in his hoodie and gloves in preparation of carrying out the victim's execution, he and Sharp were unsuccessful because the victim detected their presence and ran a red light to flee from them. Additionally, detectives compiled cell phone and mapping data to determine [Santiago's] location at the time of the shooting.[4]

Trial Ct. Op., filed Aug. 22, 2019, at 1-5.

To this we add the following. Prior to trial, the Commonwealth filed a motion to admit evidence of a prior incident where Santiago was with Lowrie, the victim in this case, when the victim was shot. Commonwealth's Mot. to Admit 404B Evid., filed Aug. 24, 2016. The Commonwealth stated that Santiago was charged with drug and firearm offenses after the incident and believed that the victim had "snitched" on him. It sought to introduce evidence of the incident and a letter purportedly from Santiago to the victim regarding

---

[3] The trial court opinion states Green identified Santiago from a photo array, but the testimony establishes that the police showed her a photograph from Facebook when she was at the station the day after the murder. N.T., Sept. 11-15, 2017, at 143-44, 570-71.

[4] The map does not place Santiago directly at the scene, but rather mapped the cell towers Santiago's phone used throughout the day. *See* Cmwlth. Exh. 40-41.

the "snitching." The trial court allowed the evidence "to be used for purposes of establishing motive and identification." Order, filed Jan. 6, 2017.

Further, at trial, Greene testified about the day of the shooting and her identification. Santiago cross-examined her regarding her statements and identifications. The Commonwealth elicited on direct examination that Greene had a prior *crimen falsi* conviction and was on probation at the time of trial. Santiago did not conduct any cross-examination related to the conviction or any potential bias due to Greene's probation status.

The victim's mother, Angelica Lowrie, testified that her son had been shot in a prior incident, and, after that, "they were saying that [the victim] snitched" on Santiago. N.T., Sept. 11-15, 2017, at 450. She testified that she found a letter from Santiago to her son, dated while both were incarcerated, where Santiago said that the victim had told a private investigator that Santiago had "hit[] back" and "was shooting." *Id.* at 452, 454, 459-60. It stated, "At the end of the day I still got love for you, but I can't fuck with you." *Id.* at 459. The letter concluded,

> [W]hen I come home, I ain't going to do no more shit with you, but I ain't going to have too much rap for you either. We can talk about this situation face-to-face, if you want, though. I should be home soon towards the end of this year or early next year, so whenever you come home, we'll talk about it. Whatever happens after that happens, but like I said, I ain't going to deal no shit, but if you force my hand, then you know how I get down already. Just sayin'. Mark my words, I'm still going to drop that nigga, though, the other one, too, if you wanna, W-B, you can -- you just gotta get someone to do a three-way, but how you did me was fucked up, but I'm over it.

> Deep down you know I saved your life, and deep down you know for a fact I wouldn't have left you fucked up in jail.
>
> I had to write you to get all this shit off my chest. At the end of the day, just put yourself in my shoes and you will know exactly how I feel and why I feel like this. It is what it is.

*Id.* at 460-61.

In addition, Detective Anthoy Fetrow testified that Santiago's phone and the phone the victim was using on the day of the murder[5] exchanged 55 messages on the day of the murder. The content of the messages was not available. *Id.* at 507-08.

Further, Detective George Ripley identified Santiago from the video footage. *Id.* at 327. Detective Ripley testified that after the prior shooting, Santiago helped the victim and took the victim to the victim's grandfather's house. *Id.* at 330-31. On cross-examination, Detective Ripley agreed that Santiago already was in custody when he viewed the video of the murder and identified Santiago, and, on re-direct, he described the identification process as follows:

> The video allowed us to stare at them for a long, tons of time, if you get right to it. We spent a lot of time watching the video itself, studying back and forth, the way somebody is running over a movie, their height, approximate height and built, their clothing, how their face looks, there are unique features to it and these are things that I use in, not only in this process, but anybody, I would use in any process to recognize an individual that's on video. If it's somebody

---

[5] The victim was using Greene's phone on the day of the murder. N.T., Sept. 11-15, 2017, at 135.

you're familiar with, it's a little bit easier, quite frankly, and that's what was used in this case.

*Id.* at 331, 338. He stated he studied the video for four to seven hours to produce an identification. *Id.* at 339.

During trial, Santiago's counsel brought out propensity evidence about Santiago. That evidence included, but was not limited to, the following testimony of Detective Spence on cross-examination that the firearm used in the murder had been used during a prior homicide that occurred while Santiago was incarcerated. Detective Spence also said that Santiago had been a suspect in the prior shooting of the victim, as they had not ruled out that he accidentally shot the victim while firing at someone else:

> Q. . . . We've also heard, during the course of this trial, that there's another unsolved murder that was committed; correct?
>
> A. Do you need more specifics?
>
> Q. There's a homicide investigation where ballistics matched the ballistics in this case; correct?
>
> A. That is correct.
>
> Q. And in that case there, the gun wasn't recovered either; correct?
>
> A. That is correct.
>
> Q. And at the time that that happened, my client was in prison; correct?
>
> A. Yes.
>
> Q. And you have no proof that that gun passed through my client's hands; correct?
>
> A. No.

Q. You can't say that that gun went to my client, can you, from the other case?

A. No, I can't.

Q. Okay. And, in fact, in this case, you haven't recovered the gun there either?

A. No.

. . .

Q. Okay. In the case involving Dontay Lowrie where he was shot?

A. Yes, sir.

Q. Where Juan Santiago was there?

A . Yes.

Q. Juan Santiago wasn't a suspect for Dontay Lowrie's shooting, was he? In the case where --

A. I don't know if you want me to answer that.

Q. The case where Dontay Lowrie was shot when Juan Santiago was with him, not this case, not –

A. I know exactly what you're saying.

THE COURT: He asked the question, Detective, answer it.

THE WITNESS: It's possible, yes. He was a suspect that -- we were never sure of Dontay was shot by him accidentally while he was shooting back at somebody else. So the answer is, I wasn't sure if you want me to answer this.

BY [Trial Counsel]:

Q. You never charged my client for that, did you?

A. We charged him that day.

Q. No, not for shooting Dontay Lowrie.

A. Oh, you're asking me for that, no.

Q. Yeah. And, in fact, my client helped Dontay Lowrie get help that day; correct?

A. No.

Q. He didn't?

A. No.

Q. How did he get to the hospital that day?

A. We called your client. He ran into Merle Lowrie's house. We had to surround the house and then pull him out with a gun.

Q. He went in there with Dontay Lowrie --

A. They both fled. That was the closest place. I don't know how you would consider that helping him.

*Id.* at 606-09. Counsel further argued that Santiago was familiar with firearms, that both Santiago and the victim were "not choir boys," and that Santiago was on parole at the time of the shooting and had been "known to carry guns in the past." *See, e.g., id.* at 112, 813, 814.

Detective Spence further testified as to his contact with Santiago, stating Santiago was asked if he wanted to talk:

Q. Now, Detective, did you -- in the days after the shooting, did you have contact with Juan Santiago?

A. Briefly, when he was brought to the police station, he was asked if he wanted to, you know, to talk and attempted --

Q. And were you able to observe him on that day?

A. I was.

*Id.* at 571.

In his defense, Santiago presented the testimony of Suzanne Mannes, PhD, as an expert in eyewitness identification. Dr. Mannes testified about factors used to determine if an identification is reliable, and how those factors

applied to Greene's identification. ***Id.*** at 753-795. During her testimony, Dr. Mannes testified as follows regarding unconscious transference:

> Q. And if someone had prior exposure to someone and then made an ID, what would that do to their ability to make a proper identification?
>
> A. So we refer to this in a fancy term, we call it unconscious transference, which basically is a phenomenon that I'm sure you've all experienced, where you see somebody in a particular context and you know that you know them but you're not exactly sure why. And when that happens, we base our decisions on familiarity. Is that person familiar to me? Yes or no.
>
> In fact, Devonbacher did a large study in which he had eyewitnesses, mock eyewitnesses, because these are usually university students, he has them do an event unfold, and then he had some of them look through mugshot books and others not do that and then gave them an opportunity to make an identification. And the people who had seen the mugshot books were just as likely to pick somebody from the book out of a lineup as the actual person that committed the crime.
>
> So prior exposure to someone just again increases their familiarity, and when you don't have much other information to go on, you'll base a decision on that.
>
> Q. And that's one of the reason -- what effect showing somebody a Facebook page have on the person, if they were already predisposed to know the identification?
>
> A. I mean, I can't say exactly what that would do, but I would assume it would serve the same role as something, like, seeing a mugshot, I don't, you know.
>
> Q. Okay. And then in this case here, what factors did you rely upon to make your conclusion or to form your opinion?
>
> A. About the unconscious transference?
>
> Q. Yes.

A. Just basically searched science that's been done, particularly, the Devonbacher study, that was a pretty -- that was a pretty dramatic demonstration.

*Id.* at 774-776. On cross-examination, Dr. Mannes testified that the theory of unconscious transference was not in her report. *Id.* at 783.

Following Dr. Mannes testimony, the Commonwealth objected to the testimony on unconscious transference, and the trial court sustained the objection and struck the testimony. *Id.* at 793-94.

Santiago testified in his own defense. Regarding the previous shooting, Santiago testified that someone shot at Santiago and the victim, and he grabbed the victim and they hid behind cars. He said that they then went to the victim's grandfather's house, which was around the corner from the shooting, where Santiago called 911. *Id.* at 655. Santiago testified that the victim had been one of his best friends. *Id.* at 656. He stated that people thought the victim was a "snitch" because the victim did not go to jail after the shooting incident, whereas Santiago went to jail on firearm and drug charges. *Id.* at 657. Santiago stated the victim did not snitch on him. *Id.* He testified that he saw the victim at a bar about a week before the shooting and had communicated with him by text and phone calls after that day. *Id.* at 656-57. He stated he did not write the letter Lowrie testified about, and that when he was speaking to Moore, he was "basically just trying to talk tough for [his] friend." *Id.* at 660.

Counsel then asked Santiago about the day of the incident, and Santiago stated that he and his girlfriend went to Sam's Club that morning. *Id.* at 662.

The Commonwealth objected because Santiago had not filed a notice of alibi. *Id.* Trial counsel stated, "[H]e's allowed to say where he was. There's no one coming in to back him up. There's no alibi." *Id.* at 662-63. The court stated that "[i]t [was] an alibi." *Id.* at 663. Counsel then stated that he would withdraw the question, the court asked if he wanted the answer stricken, and the Commonwealth replied that it wanted it stricken.

> [Trial counsel]: If the Commonwealth doesn't want to go down that road when they do their direct then that's fine -- I mean, their cross on him, that's fine. I'll withdraw the question. We'll move on.
>
> THE COURT: [Trial counsel], do you want his last statement to be stricken?
>
> [The Commonwealth]: Yes, I would ask that.
>
> THE COURT: All right.

*Id.* The court struck Santiago's answer and directed the jury to not consider it during deliberations. *Id.* Counsel concluded the direct examination by asking Santiago if he killed the victim, if he was there when the shooting occurred, and if he knew who did it. Santiago responded "no" to each question. *Id.* at 664.

During its instructions to the jury, the trial court included the following in its flight instruction:

> There was evidence, including the video of the crime scene, as well as the still photos that showed two individuals – I'm sorry -- that tended to show that the Defendant fled from the scene. The credibility, weight and effect of this evidence is for you to decide.

*Id.* at 879.

- 13 -

A jury convicted Santiago of first degree murder, robbery, and second degree murder.[6] The trial court sentenced him to life without the possibility of parole. Santiago's direct appeal rights were reinstated, and he filed a direct appeal. We affirmed, and in November 2020, the Pennsylvania Supreme Court denied a petition for allowance of appeal.

In January 2021, Santiago filed a *pro se* PCRA petition. The court appointed counsel, who filed an amended petition. Santiago filed a motion to relieve counsel and notice of intention to proceed *pro se*. Following a hearing, the court appointed new counsel, who filed a supplemental amended PCRA petition. In December 2022, new counsel entered his appearance on behalf of Santiago. Counsel filed a second supplement to the amended PCRA petition. The court held an evidentiary hearing.

At the PCRA hearing, trial counsel testified. He stated he and Santiago took time to go over Santiago's testimony before trial. N.T., June 12, 2023, at 38. Their plan included that Santiago would talk about what he was doing on the day of the murder. *Id.* Counsel testified that "[he] didn't think of it as an alibi":

> I thought of it as [Santiago] telling where he was at that time and date and he's the [d]efendant in this case. If somebody else was going to suggest that he was somewhere else, that would be the alibi that I have to file ahead of time. I didn't think that a [d]efendant telling the jury what he was doing and where he was at is something that needed to be done in this manner.

---

[6] 18 Pa.C.S.A. §§ 2502(a), 3701(a)(1)(i), and 2502(b), respectively.

*Id.* at 40. Counsel further noted, "The way it unfolded in this trial, it wasn't -- at the time of the incident, that's not what he was talking about. He was talking about where he was beforehand." *Id.* at 41. Counsel, however, confirmed that Santiago planned to testify about where he was at the time of the murder. *Id.* at 41-42. Counsel further agreed that he did not consult with Santiago before deciding to not continue questioning on his whereabouts and withdrawing the question. *Id.* at 42-43. Counsel testified that if he had continued questioning, the court "would have probably shut [him] down" because the court said the testimony related to an alibi, and that counsel did not want to have another argument in front of the jury. *Id.* at 43.

Trial counsel's testimony then proceeded as follows:

> A. So I don't think my client needed to give notice because he has a [F]ifth [A]mendment right to not talk before he comes to court and to not say what he needs to say. So he stood up to say what he needed to for his defense. The [c]ourt did stop me. He got his side of the story out. The [c]ourt didn't get rid of what he said at the time.
>
> . . .
>
> I stand by the fact that my client could have got up and said he was in another country at the time if he wanted to, that's up to the jury to believe him or not. Again, I didn't feel at that moment in time it was anything that needed to be more than what it was.
>
> Q. In fact, your position that your client has the right to do that is supported by Pennsylvania -- you know, that it's supported by Pennsylvania procedural rules and Pennsylvania case law around the [F]ifth [A]mendment, you're aware of that, right?
>
> A. Correct.

- 15 -

Q. All right. You didn't make any of those arguments when the [c]ourt said to you it's an alibi and the objection was based on a lack of notice.

Can you tell us what the strategic rationale for not saying to the [c]ourt and the Commonwealth, there is this rule that says that I don't have to give notice and there is Pennsylvania case law that says you can't even comment on it or cross-examine him on it? What's the strategic rationale for not doing that?

A. I can't give you one right now.

Q. Do you think that having Mr. Santiago begin to explain where he was at the time of the crime, then having him interrupted by the prosecutor's objection, him stopping, and then the testimony be stricken, did you think that that might raise some concerns in the minds of the jury about his veracity and the integrity of your defense?

A. I don't remember thinking of it that way at the time. But again, like the other issue you pointed out, I can see how that's what happened.

Q. Well, did you wonder back then, not today, back then, did you wonder if the jury was -- if the jury was wondering why isn't he being allowed to explain where he was and does the reason have something to do with the truth of the alibi? Again, that maybe he wasn't playing -- he and you weren't playing by the rules. Did you think about that possibility?

A. At the time, yes.

Q. You did?

A. To an extent. But I didn't think it was that big of a deal.

*Id.* at 46-49.

Regarding the propensity evidence, trial counsel testified that both Santiago and the victim had prior records and both "r[a]n in the street and d[id] things they [we]re not supposed to." *Id.* at 56. He stated both Santiago and the victim were "less than savory," and their prior records would come

out at trial and "[t]here [was] no way . . . to tackle that situation other than to embrace it and not make it a trial issue." *Id.* Regarding the testimony that Santiago was on parole, counsel stated, "[I]n the context of this case and how they found Mr. Santiago,[ which was with his parole agent], there was no way to get around the fact that he was with a parole agent." *Id.* at 61.

Regarding the testimony that trial counsel elicited about the firearm's use in a prior homicide, PCRA counsel pointed out that the Commonwealth had not sought to introduce evidence that the weapon had been used in a prior case. *Id.* at 61-62. Trial counsel testified that the prior homicide occurred while Santiago was in prison, and that "part of [the] defense was it was some other person that did this." *Id.* at 64. He stated:

> So they are saying that my client had that gun. The only way my client could have had that gun was that somebody needed to give it to him. They didn't have any evidence that my client gave that gun to them. And there is [no] way my client could have got it because he was in prison. No evidence that that gun -- where that gun came from. So at the end of the day that means that somebody else did both shootings, not just that one, the other one. Because it's impossible for my client to do the other shooting if he's in prison.

*Id.* at 65. When asked if he was familiar with how regularly and easily firearms are passed from one criminal to another, he responded that he was, "but the jury [was] not. That [had] been [his] experience in many times when [he] asked them after the fact." *Id.* at 66. As for the testimony about whether Santiago was charged in the prior shooting of the victim, counsel stated:

> This was in the context of showing that [Santiago] and [the victim] were friends. And that was important in the trial

- 17 -

that we had, our trial, that they really didn't show a reason for why . . . [Santiago] would have been the one shooting [the victim], some perceived beef that the Commonwealth was talking about.

So it was a way to show that to A, diffuse what happened in the previous incident because Mr. Santiago wasn't viewed as the aggressor, and B, he also helped [the victim] out, at least that's what everybody kind of agreed to.

*Id.* at 71.

Regarding Greene's cross-examination, trial counsel testified that he had informed the trial court during trial that one of the defense theories was that the murder "was a drug deal gone bad." N.T., Jul. 21, 2023, at 6. He noted that on direct examination, Greene acknowledged that she had a fraud conviction and was on probation at the time of trial. *Id.* at 9. He said that he did not cross-examine Greene about the fraud conviction and any bias due to her probationary status because "[i]t was asked on direct, and [he] didn't want to go into it again. [His] experience in these cases [was] she's up there, she's practically in tears, her boyfriend died. [He] didn't want to make it look like [he] was going after her too much." *Id.* When PCRA counsel stated the transcript revealed that he had gone "after her a good bit during cross[-]examination," trial counsel replied,

[I]t[ was] one thing to cross-examine somebody. It[ was] another thing to interrogate them. It[ was] another thing to beat them to death having them up there for an hour-and-a-half to three hours. It doesn't look good all the time in front of a jury. So you have to pick and choose your battles. I'm not an attorney that's going to go after somebody forever. It came out, they heard it, and that was good enough for me.

*Id.* at 10. He stated he did not mention it during the closing because

[he] was in the middle of trial at the time. Sometimes when you do closing statements, you don't remember everything. Also, [he] d[id]n't remember [his] mindset as to this particular part. All [he] kn[e]w, what [he] remember[ed] about Ms. Greene, is [he] did go after her hard. There are some things [he] just thought were left better unsaid. They heard it. The jury had ample opportunity to take that into account.

*Id.* at 11. He stated his "main goal was to convince that jury that they didn't have a proper ID of him, which to this day [he didn't] think they did." *Id.* at 11. Counsel was "convinced that Ms. Greene had eyes in the back of her head. And [he thought he] beat that to death in [his] cross-examination and in my closing." *Id.*

Regarding Dr. Mannes' testimony on unconscious transference, counsel testified that he did not know about the testimony until the day the expert came to testify. N.T., Jun. 12, 2023, at 31, 33. He testified that he did not realize the "concept itself" was not in the report, and believed she was expounding on something contained in the report. *Id.* at 32. Counsel stated that he did not inform the Commonwealth about the testimony. *Id.* Counsel further stated the concept was new even to the expert. *Id.* at 33. He testified he thought it was something the expert could testify to "because she was coming in here to talk about how her expert observations concerned this case and what was applicable. And being that this was an evolving field, [he] didn't think it was something that she couldn't talk about." *Id.* at 33-34.

Counsel next testified that he did not object when Detective Spence said Santiago "attempted" to do something after the detective asked if he wanted

to talk, because counsel did not "remember the jury reacting in a certain way because he didn't talk to the police." *Id.* at 51. He testified whether Santiago stayed silent "was not a major issue at trial," and that "[n]obody made a big deal about it." *Id.* at 53. Counsel stated it was an "innocuous answer and question," reasoning it "was one statement made by the detective that he never really finished." *Id.* at 53-54. Counsel noted that "there are times in trial that even if a minor issue occurs you don't want to bring attention to it, and this would probably be one of those situations." *Id.* at 54.

Counsel testified regarding the flight jury instruction, stating that "looking back" "the [c]ourt shouldn't have said" that the evidence "tended to show the Defendant fled." N.T., Jul. 21, 2023, at 13. He agreed that the "instruction tells the jury that the fact the perpetrator was fleeing allows them to draw the inference that the perpetrator was the [d]efendant." *Id.* at 14. He stated he "didn't catch" the use of "the defendant" and, if he had, he would have objected. *Id.* at 15-16.

The PCRA court granted the petition as to two claims—ineffectiveness for presenting, and then aborting, an alibi defense and for failing to cross-examine Greene about her probationary status and its impact on her motive to testify consistent with the Commonwealth's theory of the case.[7] As relief,

---

[7] As discussed below, it is unclear whether the PCRA court granted relief based on a third claim—that trial counsel was ineffective for inviting, eliciting, and failing to object to inadmissible propensity evidence. The court stated counsel was ineffective, but also found that he had an "objective basis" for presenting the testimony.

the court granted a new trial. The Commonwealth timely appealed, and Santiago filed a cross-appeal.

The Commonwealth raises the following issues:

I. Did the PCRA [c]ourt err in granting [Santiago's] PCRA where trial counsel was not ineffective because:

a. [Santiago] failed to demonstrate prejudice from trial counsel aborting his alibi defense where [Santiago] failed to present said defense at the PCRA hearing?

b. [Santiago] failed to demonstrate prejudice from trial counsel introducing propensity evidence where trial counsel had a reasonable basis for his actions?

c. [Santiago] failed to demonstrate prejudice from trial counsel failing to cross-examine witness Greene on her probation status where the jury had already been made aware of it?

Commonwealth's Br. at 4.

Santiago raises the following issues:

i. Did the [PCRA] court err and abuse its discretion in declining to find counsel ineffective for failing to object to Detective Spence's testimony that Santiago was asked if he wanted to talk and then "attempted" to do something, violating his right to silence under the Pennsylvania and United States Constitutions?

ii. Did the [PCRA] court err and abuse its discretion in declining to find counsel ineffective for failing to object to the wording of a flight instruction that instructed the jury that there was evidence that the defendant fled from the scene of the crime, when the question of identity was the key issue at the trial?

iii. Did the [PCRA] court err and abuse its discretion in declining to find counsel ineffective for failing to provide the Commonwealth with notice of the most crucial piece of his expert's testimony, the phenomenon of "unconscious

transference," thereby precluding him from being able to present it and argue it.

Santiago's Br. at 6 (PCRA court's answers omitted, emphasis removed).

On appeal from the denial or grant of relief under the PCRA, our review is limited to determining whether the PCRA court's ruling is supported by the record and free of legal error. **Commonwealth v. Rosario**, 314 A.3d 888, 892 (Pa.Super. 2024).

The issues raised by both parties involve whether counsel was ineffective. To prevail on an ineffectiveness claim, the petitioner must establish: "(1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result." **Commonwealth v. Spotz**, 84 A.3d 294, 311 (Pa. 2014). "[C]ounsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on appellant." **Commonwealth v. Ousley**, 21 A.3d 1238, 1244 (Pa.Super. 2011) (quoting **Commonwealth v. Rivera**, 10 A.3d 1276, 1279 (Pa.Super. 2010)). "The failure to prove any one of the three [ineffectiveness] prongs results in the failure of petitioner's claim." **Id.** (quoting **Rivera**, 10 A.3d at 1279).

In deciding whether counsel lacked a reasonable basis, "a court will not find counsel to be ineffective if the particular course chosen by counsel had some reasonable basis designed to effectuate" the defendant's interest. **Commonwealth v. Williams**, 899 A.2d 1060, 1063-64 (Pa. 2006) (quoting **Commonwealth v. Rivera**, 773 A.2d 131, 140 (Pa. 2001)). "If counsel's chosen course had some reasonable basis, the inquiry ends and counsel's

- 22 -

assistance is deemed effective." *Id.* at 1064. "To establish the third, prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness." ***Commonwealth v. Chmiel***, 30 A.3d 1111, 1127-28 (Pa. 2011).

**The Commonwealth's Appeal**

The Commonwealth first argues that the court erred in finding counsel ineffective for abandoning Santiago's alibi defense. The Commonwealth agrees that the court erred at trial when it sustained the Commonwealth's objection to Santiago's testimony about his whereabouts on the day of the incident because he had not filed an alibi notice. It argues, however, that Santiago failed to prove he was prejudiced by this error. It points out that Santiago offered no evidence at the PCRA hearing as to what his testimony regarding his whereabouts on the day of the murder would have entailed. The Commonwealth claims that this failure prevents a finding of prejudice. It relies on cases setting forth the standard for failing to call a potential witness. The Commonwealth further argues Santiago cannot establish prejudice due to the overwhelming evidence presented at trial.

Santiago responds that the "Commonwealth misreads both the trial record and the PCRA record with respect to prejudice." Santiagos's Br. at 26. He maintains that, prior to trial, he and trial counsel agreed that Santiago would testify to an alibi defense, and at trial, Santiago took the stand and began testifying about the activities of his day. He points out that the

Commonwealth objected, and although the objection had no basis, he claims that trial counsel "offered to strike Santiago's testimony and not pursue any further questioning regarding his whereabouts at the time of the crime." *Id.* Santiago maintains counsel lacked any reasonable basis for not objecting, withdrawing the question, and allowing the answer to be stricken.

Santiago further argues that the present circumstances are not analogous to failing to call a witness. Rather, he claims prejudice resulted from the mere omission of Santiago's testimony, as he was prevented from testifying about the alibi even though he and counsel had prepared the testimony. He argues "[i]t strains credulity to assume that no juror would surmise from those events that there was something that the prosecutor knew that so undermined his alibi that his lawyer thought better about presenting it." *Id.* at 28.

Santiago argues this was a structural error that did not require a showing of prejudice. Santiago maintains that counsel must consult with a defendant and obtain consent to a course of action and, here, counsel and Santiago agreed to present alibi testimony and counsel made a unilateral decision to abort the alibi path. He further maintains that even if prejudice was required, he established prejudice, as the evidence was not overwhelming.

Pennsylvania Rule of Criminal Procedure 567 governs notices of alibi defense. It provides that a defendant who intends to offer an alibi defense at trial must file a "notice specifying an intention to offer an alibi defense, and

shall serve a copy of the notice and a certificate on the attorney for the Commonwealth." Pa.R.Crim.P. 567(A). If the defendant fails to file and serve the notice, the court may exclude any alibi evidence offered by the defendant, "except testimony by the defendant" or may grant a continuance to enable the Commonwealth to investigate the evidence. Pa.R.Crim.P. 567(B). The Rule provides an exception, however, where the alibi testimony will come from the defendant:

> A defendant may testify concerning an alibi notwithstanding that the defendant has not filed notice, but if the defendant has filed notice and testifies concerning his or her presence at the time of the offense at a place or time different from that specified in the notice, the defendant may be cross-examined concerning such notice.

*Id.* at 567(G).

Where a defendant presents evidence of an alibi, the court must instruct the jury as to an alibi defense:

> An alibi instruction is required if the defendant presents evidence which covers the time period when the crime was committed and which puts him at a different location than that of the crime scene. . . .
>
> It will be the duty of the trial judge to carefully instruct the jury as to the relationship of the evidence of the prosecution and the evidence of the defendant as each bears upon the essential elements of the crime charged. Where an alibi defense is presented, such an instruction is necessary due to the danger that the failure to prove the defense will be taken by the jury as a sign of the defendant's guilt. The instruction on alibi is to emphasize that the defendant is not required to disprove any elements of the crime charged, but that the defense's evidence of alibi, even if not wholly believed, may create a reasonable doubt.

*Commonwealth v. Poindexter*, 646 A.2d 1211, 1218 (Pa.Super. 1994) (internal citations omitted); *accord Commonwealth v. Jones*, 210 A.3d 1014, 1017 (Pa. 2019) (finding appellant entitled alibi charge to assess his alibi evidence when he testified he was at his residence at time of crime). "Although an alibi may be stronger if accompanied by corroborative evidence, even absent such proofs a defendant's testimony that he was elsewhere when the crime occurred, standing alone, amounts to an alibi defense, and it is for the jury to decide how much weight to give such testimony." *Jones*, 210 A.3d at 1017.

The PCRA court awarded relief on this claim, finding the underlying claim had merit, counsel had no reasonable basis for abandoning the line of questioning, and Santiago established prejudice:

> In light of Rule 567, [Santiago's] second claim has arguable merit.
>
> At the PCRA hearing, [trial counsel] was questioned about his plan regarding [Santiago's] testimony. PCRA Hr'g. Tr., 38:6-19, June 12, 2023. [Trial counsel] testified:
>
>> I didn't think of it as an alibi. I thought of it as him telling where he was at that time and date and he's the [d]efendant in this case. If somebody else was going to suggest that he was somewhere else, that would be the alibi that I have to file ahead of time. I didn't think that a [d]efendant telling the jury what he was doing and where he was at is something that needed to be done in this manner. In my opinion, the Commonwealth not talking about it only hurt their case.
>
> *Id.* at 40:2-11.
>
> He continued:

[b]ut I do recall that there was issues with some of the witnesses. And if Mr. Santiago didn't talk about it, it would make one of their witnesses inconsistent as well. So if the Commonwealth wanted to leave that thread un — how do you want to put it, like dangling, then fine. It gave me something to talk about in my closing.

*Id.* at 41:1-7.

When asked about concerns regarding the Commonwealth impeaching the alibi with the lack of notice, [Trial counsel] testified, "I mean I guess. I still — I didn't see it as an alibi . . . it wasn't — at the time of the incident, that's not what [Defendant] was talking about. He was talking about where he was beforehand." *Id.* at 41:13 — 17. [Trial Counsel] provided further insight into his reasoning when he testified that "I didn't want to have another argument or disagreement in front of the jury over something like that." *Id.* at 43:14 -16.

He went on to testify "[i]t wasn't about displeasing the [c]ourt. I don't think the [c]ourt was upset or anything like that. It was more about how it would appear to the jury. And it was at the moment while it was all happening and unfolding." *Id.* at 43:25 - 44:4.

Despite [trial counsel's] testimony, this [c]ourt finds [trial counsel's] actions lacked a reasonable basis. Trial counsel failed to cite the law which clearly supports the argument [he] was making to the Court. Additionally, by not advocating for his position and offering to withdraw the question, [trial counsel] failed to preserve the issue for direct appeal. As a result, trial counsel's actions cannot reasonably be considered to effectuate [Santiago's] interests. It is unlikely that competent counsel would make a similar decision to stop arguing his position, withdraw the question and fail to preserve the issue for appeal. As a result, this Court finds [Santiago's] allegation succeeds on the second prong of analysis.

[Trial counsel's] failure to argue the law and to preserve the issue for appeal caused prejudice in that [Santiago's] defense strategy hinged upon the ability to testify as to his whereabouts at the time of the homicide. Through trial counsel's inaction, that is failing to argue the law under

> Pennsylvania Rule of Criminal Procedure 567 and then withdrawing the question, not only did [Santiago] lose the ability to testify in his own defense but the Court instructed the jury to disregard any testimony pertaining to his alibi. Further, by withdrawing the question trial counsel failed to preserve the issue for appeal. In light of the foregoing, [Santiago] established that trial counsel's action or inaction resulted in actual prejudice.
>
> [Santiago] is successful in meeting all three elements of the test for ineffective assistance of counsel. As a result, [Santiagos'] second claim is successful.

PCRA Ct. Op., filed Jan. 2, 2024, at 22-25 .

We agree with the PCRA court that the underlying claim—that the court erred in not permitting Santiago to testify as to an alibi defense without providing notice—has arguable merit. We further agree that counsel lacked a reasonable basis to not argue before the trial court the right to pursue such testimony, as he and Santiago had discussed this testimony in preparing for trial and the testimony was admissible.

We, however, conclude that Santiago failed to establish he was prejudiced by counsel's error. Santiago's claim that the mistake here constituted structural error that did not require proof of prejudice is meritless. There are three categories of ineffectiveness claims for which prejudice is presumed and the claimant need not prove it: "(1) the actual denial of counsel, (2) state interference with counsel's assistance, or (3) an actual conflict of interest burdening counsel." **Commonwealth v. Lambert**, 797 A.2d 232, 245 (Pa. 2001) (cleaned up). Although structural errors are not subject to harmless error analysis on direct review, when raised in the context of an ineffectiveness claim, the "petitioner must show prejudice in order to obtain a

new trial." **Weaver v. Massachusetts**, 582 U.S. 286, 305 (2017).[8] Santiago's claim does not fit into any of the three categories **Lambert** cited, and even assuming that the instant error was a "structural" one, under **Weaver**, Santiago was not entitled to a presumption of prejudice.

Santiago was therefore required to establish prejudice and failed to do so. He presented no testimony or evidence about what he had been prevented from testifying to and, therefore, it is not possible to determine whether he was prejudiced by the omission. His alibi testimony could be wholly plausible or completely impossible, or somewhere in between. Without knowing what he would have said, we cannot say the outcome of the trial would have been different had the jury heard the testimony. **Commonwealth v. Sneed**, 45 A.3d 1096, 1109 (Pa. 2012) (petitioner failed to establish prejudice where he did not show any statement from potential witnesses would have been "beneficial under the circumstances of the case").

The Commonwealth next argues the PCRA court erred in finding counsel ineffective for introducing and allowing the introduction of propensity evidence because Santiago failed to establish that his counsel lacked a reasonable basis for his actions. It further maintains Santiago did not prove prejudice. Regarding the reasonable basis prong, it notes trial counsel's testimony that in his experience, the jury would think both individuals were "less than savory," and he addresses such a situation by "embrac[ing] it and not

---

[8] **See also Commonwealth v. Tucker**, No. 656 EDA 2020, 2021 WL 2904721, at *3 (Pa.Super. filed July 8, 2021) (unpublished mem.).

mak[ing] it a trial issue." Commonwealth's Br. at 21 (citations omitted). The Commonwealth asserts, moreover, that because Santiago was going to testify, his record would therefore have come out regardless of counsel's actions. It also points out that the jury would hear that Santiago was in prison until December 2015, so the jury would know he was on parole at the time of the January 2016 murder.

The Commonwealth further notes that trial counsel testified that he believed he could use Santiago's incarceration to his advantage. Trial counsel explained that his strategy was to suggest that because Santiago was in prison when the gun was used in the previous killing, Santiago could not have committed the prior crime and therefore did not commit the instant murder. It notes that counsel further testified he felt comfortable talking about Santiago's parole status because it was going to come out in any event, and he could create doubt by arguing Santiago would not have continued reporting to his parole officer if he had just killed someone. The Commonwealth highlights counsel's testimony that Detective Spence's statements regarding Santiago's previous dealings with the victim did not harm Santiago because "[w]hy would [Santiago] save [the victim] one day and then later come mow him down." *Id.* at 23.

The Commonwealth also argues lack of prejudice. Regarding counsel's remark in closing that Santiago had been known to carry guns, the Commonwealth noted the court instructed that closing arguments were not evidence and it was one comment in a 40-minute closing. The Commonwealth

further points out that Santiago did not ask his trial counsel any questions about his claim that counsel should have objected to the victim's mother's testimony. The Commonwealth therefore maintains that trial counsel had a reasonable basis to elicit and to not object to the evidence, and Santiago failed to show another course would have had a substantially greater potential for success. It also claims Santiago failed to establish prejudice, alleging the evidence was overwhelming.

It is not clear that the PCRA court intended to include this claim in its grant of relief. The PCRA court concluded the underlying claim had arguable merit and that Santiago was prejudiced by the admission of the evidence, but found that counsel had an "objective basis" for admitting the testimony. Further, in declining to address Santiago's claim of cumulative prejudicial effect, the PCRA court stated that it found his "claims of ineffective assistance of counsel are valid for failing to pursue [Santiago's] alibi defense and for failing to cross-examine Windy Greene regarding how her probationary status may have affected her testimony." PCRA Ct. Op. at 44. It did not include the propensity evidence claim. Regardless, we find Santiago did not establish his counsel lacked a reasonable basis for the strategy regarding the challenged evidence.

In addressing the claim, the court found the following:

> [Santiago] alleges that trial counsel was ineffective for inviting, eliciting and failing to object to a raft of inadmissible propensity evidence. [Santiago] cites to portions of the trial transcript wherein trial counsel mentions an earlier homicide case wherein [Santiago] was never

charged and an earlier investigation into a prior shooting of Dontay Lowrie, the victim in the present case, as well as general references that [Santiago] was "not a choir boy", had previously been incarcerated, was on probation/parole, and was "known to carry guns in the past". These references went beyond the ruling of this Court on the Commonwealth's Rule 404 (b) Motion, which permitted evidence of certain prior convictions of [Santiago], as well as a letter purportedly written by [Santiago] to the victim from prison to be used for purposes of establishing motive and identification.

Specifically, in November of 2014, [Santiago] pled guilty to a felony drug offense and person not to possess charge for which he was sentenced to state prison. The Commonwealth's theory was that [Santiago] blamed the victim for providing information or "snitching" on him to police, which led to [Santiago's] arrest and conviction. Hence, the November 2014 conviction and letter purportedly written by [Santiago] to [the v]ictim were deemed admissible for a limited purpose. The references of trial counsel noted above went beyond the rulings of th[e trial c]ourt and therefore [Santiago's] claim of ineffective assistance of counsel has arguable merit.

At the PCRA hearing, trial counsel defended his elicitation of propensity evidence for a number of reasons. Trial counsel believed it was important to be realistic with the jury to gain credibility by acknowledging that the individuals involved in the case—both [Santiago] and [the v]ictim—had criminal behaviors in their past and were not "choir boys". As to the reference that [Santiago] was on probation/parole, trial counsel believed that this fact would inevitably become known through the course of the trial. As to references of the earlier homicide, trial counsel felt it was important to demonstrate [Santiago's] lack of involvement in the earlier homicide because the same weapon was utilized in both homicides and [Santiago] was not the perpetrator in the earlier homicide thus the jury could infer that [Santiago] did not have access to the weapon for the current homicide. Finally, trial counsel's reference to the earlier shooting of [the v]ictim was an attempt to paint [Santiago] as someone who was trying to help [the v]ictim and that [Santiago] and [the v]ictim were friends, in order to dispel the Commonwealth's theory on motive for the current case.

While trial counsel was not successful with this trial strategy, he did offer an objective basis for his actions.

Moving to the prejudice prong of the **Strickland** test, we find that trial counsel's elicitation of evidence that was not and could not have been brought forth by the Commonwealth resulted in prejudice to his client. The Commonwealth had no basis to raise the prior shooting of [the v]ictim or [Santiago's] involvement, as no conviction of [Santiago] resulted from that shooting.[9] Likewise, trial counsel's theory that [Santiago] did not have access to the murder weapon was inconsistent with his later general acknowledgement that [Santiago] was "known to carry guns in the past." Trial counsel's introduction of [Santiago's] presence at the [the v]ictim's prior shooting, which the Commonwealth had no basis to introduce, had no probative value and had a prejudicial impact. [Santiago's] defense rested largely on his own credibility which was undermined by the evidence introduced by his trial counsel, as well as by counsel's statements regarding his history of carrying a weapon and not being a "choir boy". Trial counsel rendered ineffective assistance by introducing such evidence. **See, Commonwealth v. Moore**, 715 A.2d 448 (Pa. Super. 1998).

_____

[9] We point out that on direct examination, the victim's mother spoke of the prior shooting:

There was a prior incident in which some people were looking for him, and him and my son were together. They just started shooting. My son got shot in the neck and in the face when them two were together, [Santiago] got arrested at the scene. He's saying what my son -- when my son was shot, and he got arrested at the scene. He felt like he was charged with whatever he was charged with because my son talked to police.

N.T., Sept. 11-15, 2017, at 449. Further, Detective Ripley testified that he investigated a shooting that occurred in April 2014 in which the victim had been shot and that he filed charges against Santiago following the investigation. **Id.** at 317-18. He testified Santiago pled guilty to the charges and was sentenced to three to six years' incarceration, and had been released from prison on December 29, 2015. **Id.** at 318.

PCRA Ct. Op. at 27-30.

Here, we conclude that trial counsel had a reasonable basis for the testimony, particularly the line of questioning regarding the prior shooting, and statements that Santiago was not a "choir boy" and was on parole. The Commonwealth presented evidence of the prior incident and his conviction during its case. Although the strategy was not successful, based on the defense theory of the case, we cannot say counsel lacked a reasonable basis for admitting the evidence. We therefore conclude Santiago did not establish counsel was ineffective for presenting propensity evidence.

In its last issue, the Commonwealth maintains the PCRA court erred in finding counsel ineffective for failing to cross-examine Greene on her probation status. It maintains that the case is distinguishable from the relied-on precedent, and that counsel had a reasonable strategic basis for not questioning Greene regarding her probation. It further argues that Santiago failed to establish prejudice. The Commonwealth points out that on direct examination, Greene testified that she had been convicted of insurance fraud and was on probation at the time of trial. It notes that at the PCRA hearing, trial counsel testified that because it was admitted on direct examination, he did not feel he needed to bring it up a second time. Counsel stated that he "didn't want to make it look like [he] was going after her too much." Commonwealth's Br. at 28 (citation omitted). The Commonwealth notes counsel questioned Greene about her identification of Santiago and the circumstances of the shooting, and she was on the stand for almost three

hours. The Commonwealth distinguishes the case on which the PCRA court relied, **Commonwealth v. Murphy**, 591 A.2d 278 (Pa. 1991).

The PCRA court concluded Santiago established his counsel was ineffective for failing to cross-examine Greene regarding her potential bias due to her probationary status:

> [Santiago] alleges that trial counsel was ineffective for failing to conduct any cross-examination of Windy Greene, regarding her current probation status and its impact on her motive to testify consistent with the Commonwealth's theory of the case, and failing to request an appropriate jury instruction.
>
> Ms. Greene's prior convictions for *crimen[] falsi* crimes and her probationary status were immediately brought before the jury by the Commonwealth when she testified at trial. Trial counsel did not cross-examine her regarding her probationary status at any time. [Santiago's] claim has arguable merit in light of **Commonwealth v. Murphy**, . . . 591 A.2d 278 ([Pa.] 1991). In **Murphy**, the failure to cross-examine the sole identification witness about her then existing juvenile probation so as to bring before the jury any motive or information regarding favorable treatment as to her probationary status demonstrated clear ineffectiveness. On direct appeal, the judgment of sentence was reversed and remanded for a new trial.
>
> The only distinguishing factor in the present case is that the jury was aware of Ms. Greene's probationary status. However, whether that fact had any bearing on her testimony was never tested by trial counsel. The jury had no information as to whether, or if, any consideration was given by the Commonwealth in exchange for Ms. Greene's testimony. Trial counsel's rationale was that he did not want to "go after" Ms. Greene for fear that the jury might be sympathetic to her because of the death of her boyfriend (Victim). He further stated that "the jury heard it, and in my experience, that's good enough." PCRA Hr'g. Tr., 9:25 & 10:1, July 21, 2023.

In the present case, Ms. Greene was the sole eyewitness and her credibility was paramount. While trial counsel is correct that [trial counsel] cross[-]examined her considerably regarding her identification of [Santiago], his failure to question her regarding her probationary status, in light of *Murphy*, was without an objectionable reasonable basis.

Given again that Ms. Greene was the sole identification eyewitness, any failure to pursue an important line of cross-examination that might reveal motive or bias was prejudicial to [Santiago]. Trial counsel was ineffective on this claim.

PCRA Ct. Op. at 31-33.

In *Murphy*, the defendant was charged five years after a murder when the police re-interviewed two children. 591 A.2d at 278. One of the children was on juvenile probation at the time of the trial. *Id.* at 279. The Pennsylvania Supreme Court found counsel was ineffective for failing to impeach the witness through cross-examination for bias based on the witness's juvenile probationary status. *Id.* at 280-81. The Court found that it would have been legitimate cross-examination to show bias of the witness based on her juvenile probationary status and that it could "perceive of no reasonable basis for counsel's failure to cross-examine [the witness] on the basis of her then existing juvenile probation." *Id.* at 280. The Court further found the defendant was prejudiced by the failure. It reasoned that "[the witness] was the only eyewitness to the crime and her testimony was crucial to the Commonwealth's case[,]" the Commonwealth was able to charge the defendant only after the witness was re-interviewed years after the crime, and it was "incumbent upon defense counsel to bring to the jury's attention the possibility that [the witness] had a motive for testifying against the defendant, whether based

upon a formal agreement with the prosecution or a subjective belief that she would receive favorable treatment with regard to her juvenile probation." *Id.* It concluded that "[i]f defense counsel was able to show that [the witness] was biased, it would have, in all probability, affected the outcome of the proceeding." *Id.* at 280-21.

Here, we conclude counsel had a reasonable basis for not questioning Greene further about her probationary status. Counsel explained:

> My experience in these cases are she's up there, she's practically in tears, her boyfriend died. I didn't want to make it look like I was going after her too much. So the jury heard it, and in my experience, that's good enough.

N.T., July 21, 2023, at 9-10.

Unlike *Murphy*, here it is clear the jury heard that Greene was on probation. Counsel's focusing on the unreliability of the identification, and not prolonging the examination with additional lines of inquiry, under the circumstances here, was a reasonable strategy.

**Santiago's Appeal**

We now will turn to the issues raised in Santiago's cross-appeal. In his first issue, Santiago claims counsel should have objected to the following testimony from Detective Spence:

> Q: Now, Detective, did you -- in the days after the shooting, did you have contact with Juan Santiago?
>
> A. Briefly, when he was brought to the police station, he was asked if he wanted to, you know, to talk and attempted –

N.T., Sept. 11-15, 2017, at 571. He argues this referenced his post-arrest silence. Santiago maintains that "the Detective's testimony that he sought a statement and received a response that was not a statement, in a case where the jurors heard no statement, strongly suggested Santiago's invocation of silence." Santiago's Br. at 56. He contends jurors often view the exercise of the right to remain silent as an admission of guilt. *Id.* at 57 (citation omitted). He further maintains the Pennsylvania Constitution provides greater protection of the right to remain silent than the federal constitution, and where the jurors heard Santiago attempted to do something in response to a request for a statement, and no statement was entered, a violation occurred. He maintains the jury reasonably could have found that he declined to make a statement because it did not hear any statement from him.

Here, the PCRA court found the claim lacked arguable merit, counsel had a reasonable basis for not objecting, and Santiago failed to establish prejudice:

> There was no testimony that [Santiago] refused to speak with police or that he invoked his Fifth Amendment right to silence. Here, the prosecutor quickly redirected Detective Spence and avoided such a violation. This was confirmed by [trial counsel's] testimony at the PCRA hearing. [Trial counsel] indicated that "this one statement made by the detective that he never really finished it and it never got continued." PCRA Hr'g. Tr., 54:11-18, June 12, 2023. "[I]t was cut off. Whatever happened, it got cut off." *Id.* at 54:17-18. In explaining why he did not object, [trial counsel] testified that "there are times in trial that even if a minor issue occurs you don't want to bring attention to it, and this would probably be one of those situations." *Id.* at

- 38 -

54:19-20. In light of the testimony, both at trial and at the PCRA hearing, this claim does not have arguable merit.

Further, it is a reasonable trial strategy to choose when to make an objection and when to refrain in an attempt to downplay the testimony. Here, the testimony came close but did not actually indicate that [Santiago] refused to speak with the police and invoked his Fifth Amendment right. As a result, it is possible that competent counsel would have chosen not to object in a similar situation. Therefore, this claim does not lack an objective reasonable basis.

Finally, at trial, the jury heard from [Santiago], himself, and were able to judge his credibility for themselves. As a result, [Santiago] did not suffer actual prejudice.

PCRA Ct. Op. at 26-27.

The court did not err in denying the claim, as counsel had a reasonable basis to not object and Santiago has not established prejudice.[10] Here, counsel had a reasonable basis for not objecting, as he wanted to downplay the testimony where the detective did not finish the statement. **Commonwealth v. Whitney**, 708 A.2d 471, 478 (Pa. 1998) (finding counsel had reasonable basis not to object to reference to post-arrest silence where, in context, it was not likely to suggest that "silence is the equivalent of a tacit admission of guilt"). Further, Santiago has not established the testimony resulted in prejudice, as it did not occur in a context likely to suggest that his silence was in effect a tacit admission of guilt. **See Commonwealth v. Spotz**, 84 A.3d at 316 (finding no prejudice where "the context was not one in which jurors would equate invocation of Fifth Amendment rights with an implicit admission

---

[10] Because we conclude counsel had a reasonable basis to not object and Santiago was not prejudice by counsel's decision, we need not discuss whether the claim has arguable merit.

- 39 -

of guilt," the reference was limited to context and aimed at refuting claim of self-defense).

Santiago next contends the PCRA court erred in declining to find counsel ineffective for failing to object to an instruction that the evidence "tended to show that the [d]efendant fled from the scene." Santiago's Br. at 24. He argues this directed the jury to find a fact—that it was Santiago who fled the scene—when identity was contested at trial. He maintains the instruction was improper and prejudicial under Pennsylvania law and the Due Process Clause of the Fourteenth Amendment.

Santiago contends that on direct appeal, counsel argued that the trial court erred in giving a flight instruction because the evidence – a perpetrator alleged to be the defendant ran from the scene – was insufficient alone to warrant the charge. *Id.* at 60. He contends that in his PCRA petition he maintained counsel erred when the court instructed that the evidence "tended to show that the Defendant fled from the scene." *Id.* at 61. He maintains that whether he was at the scene was "fiercely contested," and it was error to present the jury with the alleged factual finding. *Id.* He argues the alteration from "two individuals" to "the Defendant" was "critically significant," because it "[i]t was no longer simply that there was flight evidence for the jury to consider; rather, it was Santiago who was fleeing." *Id.* at 62. He argues the instruction violated his due process rights and presented an improper presumption on the issue of identity and improper commentary on the critical element, which invaded the province of the jury. *Id.* at 62-63. He further

maintains the general instructions cannot cure this error. He maintains counsel had no reasonable basis for not objecting to the instruction and the instruction prejudiced him.

In the PCRA petition, Santiago alleged counsel was ineffective for failing to object to a defective flight charge at trial because the instruction, as given, presented the jury with a factual finding. Supplemental PCRA Petition, May 26, 2023, at 36. The PCRA court found the claim lacked merit because trial counsel objected to the flight instruction regarding consciousness of guilt, and the court overruled the objection, and then this Court affirmed. PCRA Ct. Op. at 34. It did not address whether counsel was ineffective for failing to object on the basis that the instruction, as given, presented a factual finding.

We conclude the ineffectiveness claim fails because the underlying claim lacks merit. The instruction tracked the language of the Pennsylvania Standard Instructions, which provide:

> There was evidence, including the testimony of [name of witness], that tended to show that the defendant [fled from the police] [hid from the police] [give specifics]. [The defendant maintains that [he] [she] did so because [reason].] The credibility, weight, and effect of this evidence is for you to decide.

Pa. SSJI (Crim) § 3.14. Furthermore, unlike cases finding an instruction created a presumption that relieved the Commonwealth of its burden of persuasion because the instruction included "language of command," the language here—"tended to show"—was not a command. **See, e.g., Francis v. Franklin**, 471 U.S. 307, 316-18, 325 (1985) (finding "are presumed" and

"is presumed" in the instructions "[the] acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted" and "[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted" were "cast in the language of command" and finding a violation of Due Process because "a reasonable juror could have understood the challenged portions of the jury instruction in this case as creating a mandatory presumption that shifted to the defendant the burden of persuasion on the crucial element of intent, and because the charge read as a whole does not explain or cure the error"); *Sandstrom v. Montana*, 442 U.S. 510, 513, 524 (1979) (holding unconstitutional an instruction stating that "[the] law presumes that a person intends the ordinary consequences of his voluntary acts").

We further note that the court provided a *Kloiber*[11] charge, listing factors the jury should consider for eyewitness testimony, and, instructing that if the jury found one of the factors is present, it must treat the identification testimony with caution. *See* N.T., Sept. 11-15, 2017, at 875-76; *Commonwealth v. Ali*, 10 A.3d 282, 303 (Pa. 2010) (noting that under *Kloiber* "a charge that a witness[']s identification should be viewed with caution is required where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the

---

[11] *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954).

defendant; or (3) had a problem making an identification in the past[]")
(citation omitted). Further, the court instructed the jury that "there is a
question of whether [Greene's] identification is accurate," that it was "not
uncommon for a witness to be innocently mistaken in his or her recollection,"
and that when assessing credibility the jury should consider various factors.
N.T., Sept. 11-15, 2017, 874, 875.

In sum, when viewed as a whole, the charge did not direct a finding of
fact. Therefore, the underlying claim—that counsel should have objected
because the court made a factual finding—lacks merit and the ineffectiveness
claim fails.

In his final issue, Santiago argues the PCRA court erred in declining to
find counsel ineffective for failing to provide notice of the identification expert's
testimony regarding the phenomenon of unconscious transference. He argues
this testimony "dovetailed with the identification procedures conducted with
the single eyewitness at trial." Santiago's Br. at 25. He contends Dr. Mannes
alerted counsel to unconscious transference, that is, the concept that
exposure to an image often results in identification based on the familiarity.
He claims it was not reasonable for counsel to fail to provide the
Commonwealth with notice that Dr. Mannes would be testifying as to the
phenomenon, even if such notice had occurred immediately before trial.
Santiago maintains that "the multiple showings of Santiago's photographs on
January 28, 2016, presented the 'textbook case' for unconscious
transference." Santiago's Br. at 68.

He further maintains this failure resulted in prejudice. He maintains that because the court instructed that there were rules to prevent surprise, the jury could believe that Santiago and his counsel "tried to put one over on the jury by shoehorning expert evidence that had not been vetted by the Commonwealth," and because evidence of the phenomenon would have undermined Greene's identification. *Id.* at 69.

The PCRA court discussed Dr. Mannes's testimony, including her testimony about the factors used to determine whether an eyewitness identification is reliable. PCRA Ct. Op. at 18-21. It concluded the brief testimony regarding unconscious transference addressed just one factor and the preclusion of the testimony as to the one factor did not result in prejudice:

> Dr. Mannes['s] opinion and testimony addressed a number of factors that impact the reliability of eyewitness identification. Her brief testimony regarding unconscious transference indicated that it was just one of a number of factors that can affect identification. The fact that the witness could not testify to an additional factor did not result in prejudice to [Santiago], as the jury had a substantial amount of information to consider regarding identification and ultimately decided to disregard it. Therefore, [Santiago's] first claim must fail.

*Id.* at 22.

The trial court did not err in denying this claim. The preclusion of the testimony as to this one factor, where the expert testified as to all other factors that contribute to whether an identification is reliable, did not prejudice Santiago. Santiago has not shown a reasonable probability that admitting the testimony would have altered the outcome of trial.

Order reversed.


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 04/30/2025